No. 18-50403

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

*v.*

CLAUDIA HERNANDEZ-BECERRA,
*Defendant-Appellant*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA
HON. MARILYN L. HUFF PRESIDING
NO. 3:18-MJ-20491-WVG-H-1

BRIEF OF *AMICI CURIAE* NONPROFIT ORGANIZATIONS,
IMMIGRANT RIGHTS AND COMMUNITY GROUPS,
AND MENTAL HEALTH PROVIDERS

IN SUPPORT OF DEFENDANT-APPELLANT

Jessica Rofé, Esq.
Selene Nafisi, *Legal Intern*
Maria Romero, *Legal Intern*
Washington Square Legal Services, Inc.
Immigrant Rights Clinic

245 Sullivan St., 5th Floor
New York, NY 10012
Tel: 212-992-7245
jessica.rofe@nyu.edu
*Counsel to* Amici Curiae

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici curiae* state that no publicly held corporation owns 10% or more of the stock of any of the parties listed herein, which are nonprofit organizations, immigrant rights and community groups, and mental health providers.

Dated: April 17, 2019
New York, NY

Respectfully submitted,

/s/ Jessica Rofé
Jessica Rofé, Esq.
Maria Romero, *Legal Intern*
Selene Nafisi, *Legal Intern*
Washington Square Legal Services, Inc.
Immigrant Rights Clinic
245 Sullivan Street, 5th Floor
New York, NY 10012
Tel: (212) 992-7245
jessica.rofe@nyu.edu

*Counsel for* Amici Curiae

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................................... i

TABLE OF AUTHORITIES....................................................................... iv

PRELIMINARY STATEMENT ................................................................... 1

INTEREST OF *AMICI CURIAE* .............................................................. 3

SUMMARY OF ARGUMENT .................................................................... 4

ARGUMENT ..................................................................................... 7

I.    Operation Streamline Impedes a Defendant's Ability to Enter a Knowing, Voluntary, and Intelligent Plea. .............................................. 7

   A. Research shows that Operation Streamline's pre-hearing conditions negatively impact the cognitive, emotional, and physical capacities of Streamline defendants, undermining their ability to enter a knowing, voluntary, and intelligent plea.................................................................................. 8

      1. *From the moment of arrest, lack of food, confinement, and sleep deprivation seriously impair defendants' mental and physical states*........................................................... 8

      2. *Federal courts have recognized that confinement, lack of food, and sleep deprivation undermine the knowing and voluntary nature of a defendant's statements*........................ 11

   B. Research shows that Operation Streamline's plea proceedings are inadequate to ensure that a defendant's plea is knowing, voluntary, and intelligent........................................................ 12

      1. *Streamline's hearing structure impedes defendants' ability to understand the nature and consequences of their pleas.* ................... 12

      2. *The overlap between immigration and criminal systems in Streamline proceedings further undermines defendants' ability to understand the nature and consequences of their pleas.* ................................................................... 20

**II.** **Against the Backdrop of Coercive Pre-Pleading Conditions and Inadequate Plea Proceedings, Magistrate Judges Must Conduct More Searching Inquiries To Comply With Rule 11.** ...........................**21**

   **A. Rule 11 codifies an extensive history in American jurisprudence of protecting the integrity of a defendant's guilty plea.** ...........................**23**

      *1. Rule 11 was established to protect a defendant's due process rights.* ...........................*23*

      *2. Amendments to Rule 11 steadily increased protections afforded criminal defendants.* ...........................*24*

   **B. A more extensive Rule 11 inquiry is necessary to protect the due process rights of defendants prosecuted through Operation Streamline.** ...........................**28**

**CONCLUSION** ...........................**30**

**APPENDIX A** ...........................**A-1**

**APPENDIX B** ...........................**B-1**

## TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*Boykin v. Ala.*, 395 U.S. 238 (1969) ................................................................*passim*

*Brown v. Poole*, 337 F.3d 1155 (9th Cir. 2003) ........................................7

*Carter v. McCarthy*, 806 F.2d 1373 (9th Cir. 1986) ................................7

*Clewis v. Tex.*, 386 U.S. 707 (1967) ......................................................11

*Diamond v. United States*, 432 F.2d 35 (9th Cir. 1970) ........................11

*Domenica v. United States*, 292 F.2d 483 (1st Cir. 1961) ..............25, 28

*Greenwald v. Wis.*, 390 U.S. 519 (1968) ..............................................11

*Kercheval v. United States*, 274 U.S. 220 (1927) ..................................23

*Majko v. United States*, 457 F.2d 790 (7th Cir. 1972) ...........................27

*McCarthy v. United States*, 394 U.S. 459 (1969) ...................................23

*Padilla v. Kentucky*, 559 U.S. 356 (2010) .............................................20

*Smith v. O'Grady*, 312 U.S. 329 (1941) ................................................23

*Taylor v. Maddox*, 366 F.3d 992 (9th Cir. 2004) ...................................11

*United States v. Carter*, 795 F.3d 947 (9th Cir. 2015) ............................2

*United States v. Cole*, 813 F.2d 43 (3d Cir. 1987) ................................29

*United States v. Escamilla-Rojas*, 640 F.3d 1055 (9th Cir. 2011) ..........4

*United States v. French*, 719 F.2d 387 (11th Cir. 1983) .......................27

*United States v. Hernandez-Becerra*,
 No. 18-50403 (9th Cir. Apr. 10, 2019) ...................................4, 15, 16

*United States v. Howard*, 407 F.2d 1102 (4th Cir. 1969) .......................27

*United States v. Lester*, 247 F.2d 496 (2d Cir. 1957) .....................25, 28

*United States v. Lincecum*, 568 F.2d 1229 (5th Cir. 1978) ...................27

iv

*United States v. Parra-Ibanez*, 936 F.2d 588 (1st Cir. 1991) ..................................29

*United States v. Roblero-Solis*, 588 F.3d 692 (9th Cir. 2009) ............................4, 22

*United States v. Rossillo*, 853 F.2d 1062 (2d Cir. 1988) ........................................29

*United States v. Timbana*, 222 F.3d 688 (9th Cir. 2000) .......................................29

*United States v. Torres*, 697 F. App'x 541 (9th Cir. 2017) ....................................12

## Constitutional Provisions
Fifth Amendment ...........................................................................*passim*

## Federal Rules
Fed. R. Crim. P. 11.........................................................................*passim*

Fed. R. Crim. P. 11 advisory committee's note to 1944 adoption..........................24

Fed. R. Crim. P. 11 advisory committee's note to 1966 amendment................24, 25

## Other Authorities
American Immigration Counsel, *Prosecuting Migrants for Coming to
    the United States* (May 1, 2018).......................................................29

Angela Irvine, Mitzia Martinez, Crystal Farmer, & Aisha Canfield,
    Ceres Policy Research, *How Operation Streamline Courts Fail to
    Provide Due Process Protections for Immigrant Defendants*
    (2019)..................................................................................*passim*

Bessel van der Kolk, *The Body Keeps the Score* (2014) ........................................16

Doug Porter, *Resistance to Operation Streamline in San Diego,
    Assembly-Line Injustice for Immigrants*, San Diego Free Press
    (July 2, 2018) ........................................................................5

H.R. Rep. No. 247 (1975).........................................................................12, 26

Joanna Jacobbi Lydgate, *Assembly-Line Justice: A Review of
    Operation Streamline*, 98 Calif. L. Rev. 481 (2010)..................................16, 17

Jude Bergkamp, Psy.D., *Operation Streamline Report* (Jan. 28, 2019)
    (unpublished report) ...............................................................*passim*

Maya Srikrishnan, *Border Report: Operation Streamline is Here*,
Voice of San Diego (July 16, 2018) ...................................................5

Michael Corradini et al., Vera Inst., *Operation Streamline: No
Evidence that Criminal Prosecution Deters Migration* (2018).......................17

Sarah Katz & Deeya Haldar, *The Pedagogy of Trauma-Informed
Lawyering*, 22 Clinical L. Rev. 359 (2016)...............................................16, 21

Shalil Shetty, *Most Dangerous Journey: What Central American
Migrants Face When They Try to Cross The Border*, AMNESTY
INTERNATIONAL ...................................................................................8

Stephen Lemons, *Operation Streamline costs taxpayers millions*,
Dallas Observer (Oct. 2010) ..................................................................16

Substance Abuse and Mental Health Serv. Admin., *Essential
Components of Trauma-Informed Judicial Practice* (2013) ...........................12

Susan Ko et al., *Creating Trauma-Informed Systems: Child Welfare,
Education, First Responders, Health Care, Juvenile Justice*, 39
Prof. Psychol.: Res. and Prac. 4 (2008)...........................................................12

## PRELIMINARY STATEMENT

This case raises a question of fundamental importance to the integrity of our federal courts: whether magistrate judges reversibly err when failing to ensure that a defendant's plea is knowing, voluntary, and intelligent where a defendant raises concerns about the coercive nature of the proceedings that materially affects their cognitive, emotional, and physical capacities. As nonprofit organizations, immigrant rights and community groups, and mental health providers, we write as *amici curiae* to answer the question in the affirmative. As we explain below, it is a court's duty to ensure that a defendant's guilty plea is knowing, voluntary, and intelligent. This duty cannot be discharged as though it were mere procedural formality, and requires a more searching inquiry under Federal Rule of Criminal Procedure 11 ("Rule 11").

New research demonstrates that defendants who proceed through Operation Streamline ("Streamline"), the Department of Justice's fast-track, "zero-tolerance" prosecution program, are subjected to detention conditions that lead to serious cognitive impairments, including attention problems, increased suggestibility, impaired memory, and slower mental processing speeds. While still suffering from the acute physical and mental effects of their detention, defendants are transferred for criminal prosecution directly to Streamline proceedings, where they are quickly processed *en masse* in abbreviated hearings. The structure of these hearings

1

disregards the continuing impact of defendants' experiences in pre-hearing detention, the unique aspects of each individual's case, and the fact that a majority of defendants report not understanding the constitutional rights they waive in entering a guilty plea or the real-life consequences that flow from it.

Yet Rule 11's mandate is clear. Since its beginnings in common law, Rule 11's guiding principle has been the protection of a defendant's plea. This protection is rooted in the idea that guilty pleas invoke fundamental constitutional rights, the waiver of which implicates grave due process concerns. Rule 11's essential safeguard requires that a defendant's guilty plea only be viable if it is knowing, voluntary, and intelligent—a determination made by an adjudicator through the plea colloquy. As the Ninth Circuit recognized in *United States v. Carter*, 795 F.3d 947 (9th Cir. 2015), the court has a duty to conduct a more searching inquiry under Rule 11 where there are indicia of circumstances affecting a defendant's mental state. In substituting procedural formality for meaningful inquiry, the magistrate court appears to have ignored the pre-plea conditions to which Streamline defendants are subjected and which were affirmatively introduced into the record. Such a reading of Rule 11 is fundamentally inconsistent with its long-established principles. Adjudicators must address the direct, tangible impact of Streamline's pre-pleading conditions on a defendant's mental state by conducting a more searching inquiry under Rule 11.

2

## INTEREST OF *AMICI CURIAE*

*Amici curiae* are 42 leading nonprofit organizations, immigrant rights and community groups, law clinics, and mental health providers.[1][2] *Amici* seek to improve the quality of justice for those subject to immigration detention, deportation proceedings, and the criminal legal system. *Amici* therefore have a keen interest in ensuring that rules governing our federal courts are correctly interpreted to give noncitizens the full benefit of their constitutional and statutory rights.

New research indicates that a majority of Operation Streamline defendants are subjected to coercive pre-plea conditions and do not understand the meaning of their guilty pleas in federal criminal court, including the constitutional rights they forego in entering them. In light of these findings, *amici* are concerned with Operation Streamline's profound impact on access to justice, human dignity, and mental and physical well-being. While the Ninth Circuit has upheld *en masse* proceedings, it has failed to consider the direct and tangible impact that Operation Streamline's pre-pleading and hearing conditions have on a defendant's mental

---

[1] No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No person—other than *amici curiae*, their members, or their counsel—contributed money that was intended to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(a)(4)(E). All parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2).

[2] The names of each organization are appended after the conclusion of this brief.

3

state. *See, e.g.*, *United States v. Escamilla-Rojas*, 640 F.3d 1055 (9th Cir. 2011); *United States v. Roblero-Solis*, 588 F.3d 692 (9th Cir. 2009). *Amici*, therefore, seek to illuminate Operation Streamline's coercive conditions, the indicia of which require adjudicators to conduct a more searching inquiry into a defendant's mental state to determine whether a plea is knowing, voluntary, and intelligent.

Collectively, *amici* respectfully submit that this Court grant the appeal in this case, where the district court affirmed the magistrate court's failure to conduct the requisite Rule 11 inquiry, despite record evidence that the appellant was subjected to pre-plea conditions that cast doubt on her ability to enter a knowing and voluntary plea. Appellant's Opening Br. at 7-13, *United States v. Hernandez-Becerra*, No. 18-50403 (9th Cir. Apr. 10, 2019) (Dkt. No. 6) (hereinafter "Opening Br.").

## SUMMARY OF ARGUMENT

In the spring of 2018, the Department of Justice ("DOJ") ordered federal prosecutors to bring criminal charges for all illegal entry and reentry offenses referred by the Department of Homeland Security ("DHS"). In response, the U.S. Attorney for the Southern District of California requested that the federal court allow Operation Streamline into California for the first time since its implementation in 2005. In July 2018, Operation Streamline was launched in San Diego.

4

Operation Streamline began as a set of immigration enforcement policies created by the DOJ and DHS mandating the mass criminal prosecution of individuals crossing the U.S.-Mexico border without inspection. Since Streamline's inception, prosecutions for petty immigration offenses have skyrocketed along the southwest border. To facilitate the mass prosecution of migrants, defendants are held in inhumane conditions in border patrol jails before being brought to federal criminal court, where magistrate judges complete all court proceedings—from arraignment to sentencing—in a single hearing.

The extension of Streamline into California generated an outcry: attorneys, advocates, and journalists alike decried its implementation as "assembly-line justice" that undermined the basic constitutional rights of criminal defendants. *See*, *e.g.*, Maya Srikrishnan, *Border Report: Operation Streamline is Here*, Voice of San Diego (July 16, 2018); Doug Porter, *Resistance to Operation Streamline in San Diego, Assembly-Line Injustice for Immigrants*, San Diego Free Press (July 2, 2018). Its extension also led to collaboration between social scientists, psychologists, and lawyers interested in investigating the lived experiences of those shuttled through the program.

In the fall of 2018, Dr. Jude Bergkamp, a forensic psychologist with twenty years of experience conducting trauma-informed interviews for those in the

criminal legal system,[3] journeyed to San Diego to observe court proceedings and interview defendants who had been processed through Streamline.  There, he encountered aspects of a criminal legal system he had never seen before: adjudicators conducted condensed and expedited hearings with multiple defendants who were shackled and appeared disoriented and distracted.  He witnessed a court system that generally disregarded the unique aspects of each case and demonstrated a lack of effort and diligence in assessing defendants' understanding of their pleas.  He set out to interview defendants and their attorneys on the real-world impact of pre-pleading conditions on a defendant's mental state.

Weeks later, a team from Ceres Policy Research ("Ceres Team"), a research group grounded in healing-informed strategies to building alternative systems of justice, followed suit.  The Ceres Team observed Streamline courts in Arizona and California and collected structured questionnaire data from defendants across both states.  The Ceres Team interviewed 46 defendants who were processed through Streamline.  While they found minor differences in the court models implemented across Arizona and California, researchers found a court system that consistently undermined the due process rights of immigrants across states.

---

[3] Dr. Bergkamp has conducted over 1,000 forensic evaluations, including assessments of competency to stand trial, insanity at the time of the crime, diminished capacity, risk of violence, and custody placement within the prison and hospital settings.  He currently serves in academia as Chair of a doctoral program in clinical psychology while continuing work as a forensic evaluator.

Together, Dr. Bergkamp and the Ceres Team's findings evidence a two-pronged system of coercion. First, pre-hearing conditions, including confinement, lack of food, and sleep deprivation, "have a clear and undeniable negative impact on the cognitive, emotional, and physical capacities" of defendants. Jude Bergkamp, Psy.D., *Operation Streamline Report* at B-17 (Jan. 28, 2018) (unpublished report) (attached as App. B) (hereinafter "Streamline Report"). Second, Streamline's *en masse* hearings and in-hearing procedures undermine a defendant's ability to understand and to navigate the high-stakes plea process. Both individually and in concert, these conditions impair a defendant's mental state to such a degree as to undermine their ability to enter a knowing, voluntary, and intelligent plea as required under Rule 11 and due process.

## ARGUMENT

### I. Operation Streamline Impedes a Defendant's Ability to Enter a Knowing, Voluntary, and Intelligent Plea.

From the moment of arrest, pre-pleading Streamline conditions begin to erode a defendant's ability to enter a knowing, voluntary, and intelligent plea. These conditions require that a magistrate judge move beyond scripted colloquies to review all relevant circumstances surrounding the constitutional validity of a plea. *See Carter v. McCarthy*, 806 F.2d 1373, 1375 (9th Cir. 1986) ("[d]etermining the voluntariness of a plea involves a review of all the relevant circumstances surrounding it"); *see also Brown v. Poole*, 337 F.3d 1155, 1159-60

7

(9th Cir. 2003) (holding that courts must focus on the defendant's reasonable understanding of the circumstances, which reflects "the proper constitutional focus on what induced the defendant to plead guilty").

**A. Research shows that Operation Streamline's pre-hearing conditions negatively impact the cognitive, emotional, and physical capacities of Streamline defendants, undermining their ability to enter a knowing, voluntary, and intelligent plea.**

*1. From the moment of arrest, lack of food, confinement, and sleep deprivation seriously impair defendants' mental and physical states.*

For those prosecuted through Streamline, the criminal legal process begins with an immigration arrest. Migrants are shackled by U.S. Border Patrol agents at the end of a perilous journey rife with violence, sexual assault, robbery, and abductions. *See, e.g.*, Shalil Shetty, *Most Dangerous Journey: What Central American Migrants Face When They Try to Cross The Border*, AMNESTY INTERNATIONAL. Frequently, migrants enter immigration custody traumatized, hungry, sleep-deprived, and in need of medical attention. They are then transported to a Border Patrol station, confined up to several days with many others, and forced to sleep on the floor in freezing cells known as "ice boxes." Lights glare day and night as migrants await their Streamline hearings. *See* Streamline Report at B-8. As their detention continues, lack of food, confinement, and sleep deprivation impair defendants' cognitive, emotional, and physical capacities.

8

Food deprivation and hunger are a staple of Streamline detention. Individuals receive "minimum food of poor quality," eating as little as one burrito per day. *Id.* at B-8. Confinement conditions in Border Patrol jails further undermine defendants' mental and physical states. Across jurisdictions, 88.6 percent of immigrants describe conditions that were "degrading and dehumanizing," including being confined in dirty cells and denied access to fresh air. Angela Irvine, Mitzia Martinez, Crystal Farmer, & Aisha Canfield, Ceres Policy Research, *How Operation Streamline Courts Fail to Provide Due Process Protections for Immigrant Defendants* 4 (2019) (hereinafter "Ceres Report"), http://bit.ly/ceres_border.

A vast majority report being abused or neglected by guards. *Id.* (noting that 80.5 percent of respondents reported intimidation, verbal, or physical abuse). Individuals describe sleeping on the floor in "a cold, crowded, concrete square with only an open toilet." Streamline Report at B-6. Others report being confined in a four-by-fifteen-meter room used to house twelve people at time. *Id.* at B-4. As a result, those detained experience "acute states of stress, insomnia, permanent traumatic reactivation, and acute psychotic states." *Id.* at B-11. The impact of confinement continues after detention, manifesting in serious cognitive impairments such as "concentration and attention problems, short-term memory troubles and mental rumination" as defendants enter their Streamline hearings. *Id.*

9

In addition, sleep deprivation directly interferes with defendants' ability to navigate their fast-paced, complex, and high-stakes Streamline proceedings. Over 80 percent of defendants reported detention conditions that undermine their ability to sleep. Ceres Report at 4 (noting Streamline defendants were subjected to cold temperatures, had no access to blankets, and were held in facilities where bright lights were on all night). Lack of sleep leaves defendants with impaired cognitive functioning, "including alterations in perception, attention, memory, executive functions, and affective processing." Streamline Report at B-12. During Streamline plea colloquies, sleep-deprived individuals are left "less discriminating in handling ambiguous material, less confident, [and] more open to leading remarks." *Id.* at B-13. Even a single night of sleep deprivation can strongly affect issues of memory and attention. *Id*. Ultimately, Streamline's confinement conditions and attendant sleep deprivation have "a clear and undeniable negative impact on the cognitive, emotional, and physical capacities of an individual." *Id.* at B-17.

Taken together, this research demonstrates that Streamline's pre-hearing conditions impair a defendant's mental state, raising grave constitutional concerns regarding a defendant's ability to enter a knowing, voluntary, and intelligent plea.

10

   2. *Federal courts have recognized that confinement, lack of food, and sleep deprivation undermine the knowing and voluntary nature of a defendant's statements.*

Courts have long acknowledged that confinement, lack of food, and sleep deprivation impair a defendant's mental state and impact the voluntariness of their statements. *See Clewis v. Tex.*, 386 U.S. 707, 712 (1967) (finding defendant's statement involuntary and inadmissible where defendant's faculties were "impaired by inadequate sleep and food, sickness, and long subjection to police custody"); *see also Greenwald v. Wis.*, 390 U.S. 519 (1968) (finding confession involuntary where defendant was interrogated without food or sleep); *Taylor v. Maddox*, 366 F.3d 992, 1015-16 (9th Cir. 2004) (finding defendant's confession involuntary based in part on the fact that he "was given no food, offered no rest break, and may or may not have been given any water"); *Diamond v. United States*, 432 F.2d 35, 40 n.4 (9th Cir. 1970) (ordering an evidentiary hearing to determine voluntariness where defendant was, *inter alia*, put in disciplinary confinement, deprived of food, and "forced to sleep on a cold cement floor, without any blankets"). Under this established precedent, Streamline's pre-pleading conditions impair defendants' mental states and call into question the knowing and voluntary nature of their subsequent pleas.[4]

---

[4] Courts have recognized the impact of pre-plea trauma in other criminal legal contexts. As noted by The National Association of State Mental Health Program Directors Association, "powerlessness, fear . . . and a constant state of alertness"

When defendants' mental states are so impaired as to impact the voluntariness of their guilty pleas, magistrate judges must venture beyond a scripted plea colloquy to ensure that pleas are constitutionally sound. *See United States v. Torres*, 697 F. App'x 541, 542 (9th Cir. 2017) ("If a defendant's statements during a plea colloquy raise questions about his mental state, the court accepting the plea has a duty to inquire further.").

**B. Research shows that Operation Streamline's plea proceedings are inadequate to ensure that a defendant's plea is knowing, voluntary, and intelligent.**

*1. Streamline's hearing structure impedes defendants' ability to understand the nature and consequences of their pleas.*

The Supreme Court has emphasized that, at a minimum, defendants must understand the rights they waive when entering a guilty plea. *Boykin v. Ala.*, 395

---

may impede defendants' abilities to understand and navigate their plea hearings, including "memory impairment; confusion about courtroom procedures; [and] inability to process implications of the plea." Substance Abuse and Mental Health Serv. Admin., *Essential Components of Trauma-Informed Judicial Practice* 1, 6 (2013). As a result, the Association calls for increased scrutiny of a defendant's plea, including potential time for adjournment to allow discussion by the courtroom team of whether and how to accept the plea. *Id.* Additionally, a number of national organizations have incorporated trauma-informed perspectives into their criminal legal practice and procedures, including the National Commission on Correctional Healthcare, the National Council of Juvenile and Family Court Judges, the National Juvenile Defenders Center, and the National Center for Mental Health and Juvenile Justice. Susan Ko et al., *Creating Trauma-Informed Systems: Child Welfare, Education, First Responders, Health Care, Juvenile Justice*, 39 Prof. Psychol.: Res. and Prac. 4, 400 (2008).

U.S. 238, 243-44 (1969); H.R. Rep. No. 247 at 7 (1975) (incorporating *Boykin* into Rule 11). Research shows that Streamline defendants do not meet even this minimal standard. In fact, Ceres survey data indicates that it is *more likely than not* that a Streamline defendant will not understand that they are renouncing fundamental rights through their guilty plea, including the right to trial, the right to appeal their conviction, and the right against self-incrimination. Ceres Report at 6. A significant majority of defendants surveyed did not understand they were in criminal court, believing instead that they were in immigration or other civil proceedings. *Id.* at 5. Eighty percent of defendants did not understand they would receive a conviction at the end of the proceeding. *Id.* at 5. This data suggests that Streamline's in-hearing mechanisms for ensuring that a guilty plea is knowing, voluntary, and intelligent are inadequate under Rule 11 and due process.

Defendants' confusion starts at the moment of prosecution. From the ice boxes of Border Patrol, migrants are transported to a federal courthouse where they become criminal defendants. Frequently, this transition occurs without defendants' full knowledge, though it carries dramatic legal consequences. *Id.* at 5.

Shackled in leg restraints, defendants are brought into a federal courtroom in groups of fifteen to twenty for a high-stakes, single-day hearing. *Id*. at 4-5 (finding that 90.9 percent of Streamline defendants reported being shackled at least once). When defendants arrive in court, *en masse*, assembly-line plea colloquies sacrifice

individualized response in favor of group conformity. A federal magistrate judge quickly conducts an initial appearance and defendants are arraigned. As the Streamline hearing unfolds, defendants remain anxious and unsure about the proceedings. Streamline Report at B-3. The magistrate judge recites scripted, "yes" or "no" questions in monotone to assess whether defendants are proceeding knowingly, voluntarily, and intelligently, including: "Do you understand the charge against you? Do you understand that you are giving up your rights? Do you voluntarily plead guilty?" Ceres Report at 6. The magistrate judge's questions are filtered through an interpreter, further obscuring their speech. *Id*. The proceedings happen so swiftly that 45.7 percent of defendants report not being asked one of the plea questions. *Id*. In the case of Ms. Hernandez-Becerra, the magistrate judge spent an average of just six minutes on each defendant. Opening Br. at 2.

Almost invariably, defendants answer "sí" to all questions. In some courts, as in San Diego, these rote recitations are interrupted by defense attorney objections to the constitutional inadequacies of the proceedings. But these objections are generally overruled as presiding magistrate judges mechanically issue sentences.

Defendants enter their proceedings with little meaningful pre-hearing counseling due to the constraints imposed by Streamline. Forty-three percent of

14

defendants report *never* meeting with an attorney before deciding whether to enter their plea. Ceres Report at 7. This suggests that a significant percentage of Streamline defendants either do not receive legal counseling regarding their pleas or have such cursory and limited encounters with their lawyers that they do not understand they are meeting with an attorney at all.

Even defendants with access to counsel meet only briefly with their attorneys in rushed, public settings. In San Diego, where Ms. Hernandez-Becerra was processed, defendants are taken from Border Patrol stations to a noisy parking garage inside the courthouse filled with tables and chairs. Streamline Report at B-8. In this lot, defendants are provided a thirty-minute meeting with a federal defender while federal marshals stand watch. *Id.* Defendants are disoriented, fatigued, alarmed, and confused. *Id.* Many "simply ask [defense] counsel to tell them what to do instead of having the capacity to make a reasoned and educated choice themselves." *Id.* at B-10; *see also* Appellant's Opening Br. at 9-13. For most, this brief interaction is the first time they have been told they are being charged with a crime, and is the only opportunity they have to receive an attorney's advice regarding the charges against them and the rights they waive by pleading guilty. Appellant's Opening Br. at 10.

Defense attorneys express concerns about individuals' cognitive functioning due to sleep deprivation, hunger, and emotional dysregulation, Streamline Report

15

at B-8, and are unable to discern whether defendants' pleas are knowing,

voluntary, and intelligent. Excerpts of Rec. at 53, *United States v. Hernandez-*

*Becerra,* No. 18-50403 (9th Cir. Apr. 10, 2019) (Dkt. No. 7) (hereinafter "Excerpts

of Rec."). Time constraints mean that important details about individual cases

likely go undiscovered. Streamline Report at B-8 (noting that defendants' brief,

thirty-minute interviews were barely enough time for introductions). For example,

there is little bandwidth in these attorney-client meetings for any proper

immigration screening. Appellant's Opening Br. at 9-10 (describing attorneys'

time-constrained interviews did not even allow for review of discovery or

discussion of plea consequences). Additionally, defendants' ongoing trauma mean

that they may not be able to communicate the facts essential to identifying

immigration relief, including asylum claims that could lead to dismissal of their

Streamline criminal cases.[5] Bessel van der Kolk, *The Body Keeps the Score* 178

(2014) (noting that recalling and relaying traumatic memories impedes areas of the

brain related to verbal expression, sense of location, and sense of time, making it

---

[5] In addition to the deportation of asylum seekers, it is likely that Streamline leads
to the deportation of U.S. citizens. Determining citizenship can be complex, and
defendants may not be aware that they have claims to citizenship. Stephen
Lemons, *Operation Streamline costs taxpayers millions*, Dallas Observer (Oct.
2010). Federal Public Defender offices in Tucson, Las Cruces, El Paso, and Del
Rio all cited examples of U.S. citizens and legal permanent residents they have
represented in Streamline proceedings. Joanna Jacobbi Lydgate, *Assembly-Line
Justice: A Review of Operation Streamline*, 98 Calif. L. Rev. 481, 533 (2010).

difficult to gather a "coherent logical narrative"); Sarah Katz & Deeya Haldar, *The Pedagogy of Trauma-Informed Lawyering*, 22 Clinical L. Rev. 359, 366, 387 (2016) (noting that clients may find it difficult to relay their stories after experiencing trauma, including memory disruption, traumatic flashbacks, and distrust in being asked about the traumatic events). Thus, "it is likely that many people with legitimate claims to asylum [are] prosecuted and deported" through Streamline. Michael Corradini et al., Vera Inst., *Operation Streamline: No Evidence that Criminal Prosecution Deters Migration* 7 (2018).[6]

Because of these systemic constraints, defendants are not given the opportunity to understand the legal ramifications of a guilty plea in Streamline courts. Even after meeting with counsel, many do not have a basic understanding of what it means to be charged with a misdemeanor or a felony in the United States, or that such convictions may leave them unable to return to the United States lawfully. *See, e.g.*, Streamline Report at B-7 (stating that a defendant "did not provide an understanding of the difference between a felony and misdemeanor, possible penalties, implications for his immigration case . . . and the specific elements of the current alleged crime," even after his initial attorney-client

---

[6] While asylum seekers have the right to an immigration hearing, defendants who wished to express a fear of return to their presiding magistrate judge felt unable to do so and were subsequently deported. Ceres Report at 6.

interview); *see also* Joanna Lydgate, *Assembly-line Justice: A Review of Operation Streamline*, 98 Calif. L. Rev. 481, 519 (2010).

Equipped with little, if any, attorney advice, defendants enter a single hearing in which a Streamline magistrate conducts initial appearances, arraigns defendants, accepts guilty pleas, and imposes sentences for several defendants at a time. After directing a colloquy question to the first defendant in the group, a magistrate judge prompts an answer to the same question moving down the row(s) of defendants. *See* Streamline Report at B-18. Some defendants appear "surprised and confused when the judge called their name, and seemed to parrot the previous answer." *Id.* at B-4. However, to facilitate fast-paced Streamline proceedings, plea colloquies are limited to scripts of "short, concrete, and close-ended questions." *Id.* at B-18.

These rote, scripted inquiries belie the importance of the rights waived by defendants as they enter their pleas, including the right against self-incrimination, the right to trial by jury, and the right to confront one's accusers. *Boykin v. Ala.*, 395 U.S. 238, 243 (1969). Courts must approach this waiver with the "utmost solicitude" to ensure that defendants fully understand the guilty plea and its consequences. *Id.* at 243-44. Yet Streamline plea colloquies fall woefully below this standard. In contrast to standard plea colloquies in criminal court, Streamline's *en masse*, assembly-line colloquies sacrifice individualized, critical responses in favor of group conformity.

18

Applying long-standing psychological principles, researchers have observed that Streamline proceedings significantly diminish defendants' individual agency as decision-makers while entering their pleas. Through repeated and fast-paced questioning, defendants experience "responsibility diffusion," in which group members who know that a previous decision is shared among several people feel less personally responsible than if the decision was made alone and without such knowledge. Streamline Report at B-18. As a result, defendants feel a diminished sense of individualized responsibility in entering their pleas. Unsurprisingly, individuals are "more likely to answer in line with the rest of the group," an issue in psychology known as "response set." *Id.*

Because of responsibility diffusion and response set, individuals are more likely to suspend critical thinking and defer to the consensus of the group. *Id.* at B-17. This issue is all the more salient given that Streamline defendants' mental states are already undermined when they enter their hearing as a result of their pre-hearing confinement. *Id.* at B-13 (defendants are "less discriminating in handling ambiguous material, less confident, [and] more open to leading remarks"). Combining individual legal cases into one *en masse* proceeding can, therefore, "undermine the individual's critical thought, unique considerations, and volitional action." *Id.* at B-18.

19

2. *The overlap between the immigration and criminal systems in Streamline proceedings further undermines defendants' ability to understand the nature and consequences of their pleas.*

Compounding these issues is the significant overlap between the criminal and immigration systems inherent to Operation Streamline. The intersection of criminal and immigration law is notoriously difficult to navigate for even experienced attorneys. *See, e.g*, *Padilla v. Kentucky*, 559 U.S. 356, 377-78, 387-88 (2010) (Alito, J., concurring). Throughout the Streamline process, the overlap between criminal and immigration proceedings makes it highly challenging for defendants to understand the transition from one system to the next. Ceres Report at 5 (noting that a significant majority of defendants did not understand whether they were in criminal or immigration court). Once defendants have entered Streamline through an immigration arrest, they are transferred to federal criminal court for their Streamline proceedings. After entering pleas, defendants who receive a sentence of time served are quickly returned to immigration custody as though they had never left it. Other defendants receive sentences of days, weeks, or months in criminal custody, and are then swiftly deported.

Enmeshed criminal and immigration consequences continue even after a defendant's release. Every migrant processed through Streamline is marked by an inescapable criminal record that carries with it significant long-term immigration consequences, including the possibility of a felony charge for later crossings,

20

potential visa ineligibility, and often loss of the ability to seek asylum.  Defendants

are often unaware of the rights they forego in pleading guilty, which extend far

beyond the right to trial.  Ceres Report at 5 (over half of defendants did not know

that their guilty plea could impact their ability to seek asylum).  Additionally,

individuals who have experienced trauma, or are in the process of experiencing

trauma, may not be able to communicate the facts essential to identifying viable

asylum claims or other immigration relief relevant to their Streamline proceedings.

Sarah Katz & Deeya Haldar, *The Pedagogy of Trauma-Informed Lawyering*, 22

Clinical L. Rev. 359, 366, 387 (2016).

The conditions of Streamline hearings undercut defendants' ability to make a

knowing and voluntary decision to plead guilty by providing insufficient access to

fulsome legal advice and encouraging group conformity.  The constitutional

concerns raised by Streamline demand a renewed focus on the safeguards designed

to ensure the integrity of a defendant's plea.  Instead, magistrate judges have

responded by conducting scripted, rote colloquies in a manner facially inconsistent

with their mandate under Rule 11 and the Constitution.

## II. Against the Backdrop of Coercive Pre-Pleading Conditions and Inadequate Plea Proceedings, Magistrate Judges Must Conduct More Searching Inquiries To Comply With Rule 11.

Operation Streamline is fundamentally inconsistent with Rule 11, which

codifies an extensive history in American jurisprudence of protecting the

constitutional integrity of a defendant's guilty plea. The protection of defendants' pleas is historically rooted in the idea that guilty pleas invoke fundamental constitutional rights—the waiver of which implicates grave due process concerns. In Streamline, defendants, caught in the nearly indistinguishable overlap between the civil immigration and criminal legal systems, enter into plea colloquies facing particularly acute consequences should they choose to plead guilty. Rather than confronting the due process challenges inherent in Streamline proceedings, adjudicators have normalized a Rule 11 procedure that prioritizes form over substance in contravention of Rule 11's historic purpose.

Rule 11 requires procedures that are consistent with constitutional due process mandates. Magistrate judges "cannot permit [Rule 11] to be disregarded in the name of efficiency." *United States v. Roblero-Solis*, 588 F.3d 692, 693 (9th Cir. 2009). To comply with Rule 11 and its implicit constitutional strictures, a magistrate judge must conduct a meaningful inquiry to ensure that a defendant's guilty plea is knowing, voluntary, and intelligent. Streamline, which promotes assembly-line proceedings with rote plea colloquies, stands in violation of Rule 11 and the constitutional protections it codifies.

## A. Rule 11 codifies an extensive history in American jurisprudence of protecting the integrity of a defendant's guilty plea.

### 1. Rule 11 was established to protect a defendant's due process rights.

A defendant's conviction based on a plea of guilty is only viable if that plea is knowing, voluntary, and intelligent. Fed. R. Crim. P. 11.[7] In practice, an adjudicator must determine that a defendant entered their guilty plea with an awareness of the constitutional rights being waived, with an understanding of the nature and implications of their plea, and without improper influence by threats or coercion. *Boykin v. Ala.*, 395 U.S. 238, 242-43 (1969); *McCarthy v. United States*, 394 U.S. 459, 466 (1969).

At common law, courts long required that a defendant plead knowingly and voluntarily because of the serious, and often punitive, consequences that guilty pleas entail. *See, e.g.*, *Kercheval v. United States*, 274 U.S. 220, 223 (1927) (noting that a guilty plea "is itself a conviction … Out of just consideration for persons accused of crime, courts are careful that a plea of guilty shall not be accepted unless made voluntarily after proper advice and with full understanding of the consequences."). This requirement is rooted in constitutional principles. *See, e.g.*, *Smith v. O'Grady*, 312 U.S. 329, 334 (1941) (holding that, if proven, the

---

[7] While on its face, Rule 11 states only that a guilty plea be "voluntary," caselaw and court practice affirm that a defendant's plea must generally be "knowing, voluntary, and intelligent." *Boykin v. Ala.*, 395 U.S. 238 (1969); *McCarthy v. United States*, 394 U.S. 459 (1969).

23

circumstances of defendant's unknowing guilty plea were "wholly irreconcilable with the constitutional safeguards of due process").

In 1944, common law protections for defendants were codified in the adoption of the Federal Rules of Criminal Procedure. In its original form, Rule 11 provided that "[t]he court … shall not accept the plea [of guilty] without first determining that the plea is made voluntarily with understanding of the nature of the charge." As noted by the Advisory Committee at the time, Rule 11 was "substantially a restatement of existing law and practice." Fed. R. Crim. P. 11 advisory committee's note to 1944 adoption. Rule 11 thus enshrined standards long established in American courts.

> 2. *Amendments to Rule 11 steadily increased protections afforded criminal defendants.*

As Rule 11 was amended over the ensuing 70 years, it continued to emphasize the vital importance of safeguarding plea procedure. Indeed, as guilty pleas have become the means by which a majority of criminal cases are settled, the Advisory Committee and Congress have consistently responded by increasing the protections afforded criminal defendants. *See, e.g.*, Fed. R. Crim. P. 11 advisory committee's note to 1966 amendment. In 1966, Rule 11 was amended to require the court to address defendants personally during plea colloquies, to inquire into defendants' appreciation of the consequences of their plea and the nature of the charges raised against them, and to make independent findings that the pleas had

24

factual bases. Fed. R. Crim. P. 11 (1966). Resolving a split among circuit courts

regarding the extent to which a defendant needed to be personally addressed, the

Advisory Committee rallied its support behind circuits interpreting Rule 11 to

require "more than a perfunctory examination." *Domenica v. United States*, 292

F.2d 483, 485 (1st Cir. 1961) (noting that "A mere routine inquiry – the asking of

several standard questions – will not suffice. . . . It is the duty of a federal judge

before accepting a plea of guilty to thoroughly investigate the circumstances under

which it is made.") (citing *United States v. Lester*, 247 F.2d 496, 499-500 (2d Cir.

1957)). In expanding protections for defendants, the Advisory Committee

emphasized that "the fairness and adequacy of the procedures on acceptance of

pleas of guilty are of vital importance in according equal justice to all in the federal

courts." Fed. R. Crim. P. 11 advisory committee's note to 1966 amendment.

In conjunction with amendments to Rule 11, the Supreme Court has

continually emphasized the vital importance of rigorous plea colloquies as a

safeguard against constitutional due process violations. In the landmark case

*Boykin v. Ala.*, 395 U.S. 238 (1969), the Court reversed a conviction where an

affirmative showing of voluntariness on the record was lacking. In deciding the

case on constitutional grounds, Justice Douglas highlighted, "A plea of guilty is

more than a confession . . . it is itself a conviction." *Id.* at 242. As such, a

defendant's plea functions as a waiver of vital constitutional rights: namely, the

25

privilege granted against compulsory self-incrimination guaranteed under the Fifth and Fourteenth Amendments; the right to a trial by jury; and the right to confront one's accusers. *Id*. at 243. Echoing the language of the Rule's drafters, the Court emphasized that the consequences of criminal proceedings demand a thorough inquiry by an adjudicator into the defendant's understanding of the charge, an issue only heightened in the Streamline context, where convictions are enmeshed with immigration consequences. As noted by Justice Douglas, the stakes faced by defendants demand "the utmost solicitude of which courts are capable" in questioning the defendant to "make sure [she] has a full understanding of what the plea connotes and of its consequence." *Id.* at 243-44. In the absence of a substantive inquiry, "ignorance, incomprehension, coercion, terror, inducements, subtle or blatant threats might be a perfect cover-up of unconstitutionality." *Id.* at 242-43.

Today, the standards of *Boykin* stand not merely as precedent; they are cemented into Rule 11 itself. Prompted by *Boykin*, Rule 11 was again amended in 1975 to ensure the rejection of pleas made as a result of force, threats, or promises. H.R. Rep. No. 247 at 7 (1975) (stating that the amendments should ensure that "the warnings given the defendant ... include those that *Boykin v. Alabama* said were constitutionally required."). Through the amendments, the Rules Committee and Congress further cemented Rule 11's role as a vital safeguard for protecting the

26

fundamental constitutional rights implicated in a defendant's plea of guilty. The amendments enumerated a detailed list of rights and effects of which courts were required to advise defendants and to ensure defendants understood. The updated Rule also heightened courts' requirement of informing a defendant of the consequences of the plea, requiring that a defendant understand "the mandatory minimum penalty provided by law, if any, and the maximum penalty provided by law." Fed. R. Crim. P. 11(c)(2) (1975).

Interpreting these amendments, circuit courts have consistently struck down plea colloquies that fail to conduct a meaningful inquiry into a defendant's decision to plead guilty. *See, e.g.*, *United States v. Lincecum*, 568 F.2d 1229, 1231 (5th Cir. 1978) (single response by a defendant that he "understands" the charge gives no assurance or basis for believing that he does); *United States v. Howard*, 407 F.2d 1102, 1104-05 (4th Cir. 1969) (finding brief questioning which included the question "Am I correct then in assuming you are making this plea voluntarily?" to be constitutionally inadequate); *United States v. French*, 719 F.2d 387, 390 (11th Cir. 1983) (trial judge must determine whether defendant is fully aware of the consequences of action before accepting guilty plea); *Majko v. United States*, 457 F.2d 790 (7th Cir. 1972) (reading indictment and asking whether defendant has discussed charge with attorney does not satisfy constitutional requirements for entering a guilty plea).

**B. A more extensive Rule 11 inquiry is necessary to protect the due process rights of defendants prosecuted through Operation Streamline.**

As described in Point I, *supra*, Streamline courts conduct the very "routine inquir[ies]" that the Advisory Committee rejected. *Domenica*, 292 F.2d at 485-86 (explaining federal clerk's single inquiry of "'Do you wish to change your plea?'" to defendant was not sufficient to establish compliance with Rule 11); *Lester*, 247 F.2d at 499, 501 (finding that judge "failed to perform his [Rule 11] duty" even where defendant stated that he "understood the charge against him" and holding that a plea of guilty is not voluntary "if the plea is entered by one who is not fully aware of the consequences of his plea"). The record shows that defendants are held at Border Patrol stations under degrading and dehumanizing pre-hearing conditions. Excerpts of Record at 55 (describing how Streamline defendants' attorneys raised to the magistrate judge that defendants had been subject to confinement at Border Patrol stations since their arrest). Despite this, Streamline courts like the one in which Ms. Hernandez-Becerra was processed fail to conduct the searching Rule 11 inquiry that such indicia require to determine whether a defendant's plea is knowing, voluntary, and intelligent. *Id.* (noting that despite the magistrate judge's recognition that "members of the judiciary are uncomfortable with [Streamline]," the magistrate judge declined to conduct a more searching inquiry into the voluntariness of Ms. Hernandez-Becerra's plea, concluding, "it is

what it is"). The failure of Streamline courts to conduct a more thorough Rule 11 inquiry is all the more egregious in light of *en masse*, expedited court proceedings. It is no wonder that defendants plead guilty at an extraordinarily high rate[8], despite the long-term immigration and criminal consequences of entering a guilty plea.

Yet the history and text of Rule 11 clearly require a magistrate judge to conduct a more extensive Rule 11 inquiry when faced with the pre-pleading conditions and hearing structure of Streamline. As the Ninth Circuit has noted, "[W]here a district court is made aware during a Rule 11 proceeding that a defendant's competency to enter a plea may be impaired, it must conduct an inquiry before accepting a guilty plea." *United States v. Timbana*, 222 F.3d 688, 705 (9th Cir. 2000)*; see also United States v. Parra-Ibanez*, 936 F.2d 588, 595 (1st Cir. 1991) (holding that a court "must broaden its Rule 11 inquiry with a view to assessing the impact" of a potentially influencing factor); *United States v. Rossillo*, 853 F.2d 1062, 1067 (2d Cir. 1988) (holding that "before finding that Rossillo's plea was voluntarily and knowingly entered," the court should have "inquired further into defendant's state of mind once the court was alerted" as to a potential concern); *United States v. Cole*, 813 F.2d 43, 46 (3d Cir. 1987) ("Rule 11 counsels a district court to make further inquiry into a defendant's competence to enter a

---

[8] For example, in 2016, 88.5 percent of individuals convicted of entry-related offenses pled guilty. American Immigration Counsel, *Prosecuting Migrants for Coming to the United States* (May 1, 2018).

guilty plea once the court has been informed" of a fact that may "impair[] his ability to make a knowing and intelligent waiver of his constitutional rights.").

## CONCLUSION

The findings of Dr. Bergkamp and the Ceres Team highlight the one-two punch of Operation Streamline's pre-pleading and in-hearing conditions. Together, these two defining aspects of Operation Streamline fundamentally impede a defendant's ability to enter a knowing, voluntary, and intelligent plea as required by Rule 11 and due process.

Courts have long held that it is error to accept a plea without an affirmative showing that a plea is voluntary and intelligent. *See Boykin v. Ala*, 395 U.S. 238 (1969). Congress and the Supreme Court, in turn, have gradually expanded court procedures to ensure this determination is accurately made, so as to protect the integrity of a defendant's guilty plea. The procedures employed by Streamline courts are simply insufficient to meet the standards set out by Congress and the Supreme Court. A court's long-recognized constitutional obligation during the pleading process requires a thorough inquiry into the voluntary, knowing, and intelligent nature of each defendant's plea—not merely a generalized, rote colloquy. To turn a blind eye to the conditions of confinement and procedural shortcuts of Streamline is to forsake due process safeguards enshrined in Rule 11. Magistrate judges must address the direct, tangible impact that Streamline's pre-

pleading and hearing conditions have on a defendant's mental state by conducting

a more searching inquiry under Rule 11.

Dated: April 17, 2019        Respectfully submitted,
New York, NY

/s/ Jessica Rofé
Jessica Rofé, Esq.
Maria Romero, *Legal Intern*
Selene Nafisi, *Legal Intern*
Washington Square Legal Services, Inc.
Immigrant Rights Clinic
245 Sullivan Street, 5th Floor
New York, NY 10012
Tel: (212) 992-7245
jessica.rofe@nyu.edu

*Counsel for* Amici Curiae

**APPENDIX A:**

**List of *Amici Curiae***

# LIST OF *AMICI CURIAE*

Al Otro Lado

American Civil Liberties Union of San Diego & Imperial Counties

American-Arab Anti-Discrimination Committee (ADC)

Americans For Immigrant Justice

Antioch University

Bender's Immigration Bulletin (LexisNexis)

Boston College Immigration Clinic

Brooklyn Defender Services

Coalition for Humane Immigrant Rights (CHIRLA)

Columbia Law School Immigrants' Rights Clinic

Cornell Law School Asylum and Convention Against Torture Appellate Clinic

Council on American-Islamic Relations - California

Dolores Street Community Services

Hofstra Law School

Immigrant and Non-Citizen Rights Clinic, CUNY School of Law

Immigrant Justice Corps

Immigrant Rights Subcommittee, Montgomery, County, MD ACLU

Immigration and Human Rights Work Group, New York University

Postdoctoral Program in Psychotherapy and Psychoanalysis

Justice Strategies

Kathryn O. Greenberg Immigration Justice Clinic, Cardozo School of Law

LatinoJustice PRLDEF

Law Office of Patricia M. Corrales

Loyola University New Orleans College of Law

Make the Road New York

Maryland Carey Immigration Clinic

Mississippi College School of Law Immigration Clinic

Muslim Advocates

NSC Community Legal Defense

Pangea Legal Services

Project South

Public Counsel

Reformed Church of Highland Park

Southeast Asia Resource Action Center

The Bar Association of San Francisco

The Florence Immigrant & Refugee Rights Project

The Justice & Diversity Center of The Bar Association of San Francisco

Transit Immigrant Assistance Silver Spring

UC Davis Immigration Law Clinic

University of Colorado Law School

UnLocal, Inc.

Washington Defender Association

Western State College of Law Immigration Clinic

**APPENDIX B:**

**Operation Streamline Report**

CONFIDENTIAL – PRIVILEGED COMMUNICATION                                    1

January 28, 2018
Operation Streamline Report
Jude Bergkamp, Psy.D.[1]

Ms. Kara Hartzler – Federal Defenders of San Diego, Inc.
225 Broadway St 900
San Diego, CA  92101

*The following format emulates the standard forensic report structure with the available data and method of collection presented first, then the method of analysis and results, with subsequent conclusory opinion.  The veracity of the opinion is based on the available data and method of analysis and may change with additional information. Specific to this report, the sequence follows the temporal progression of collected data, relevant literature review and application, and resulting conclusory opinion.*

## Experience & Training of the Undersigned
The undersigned has over twenty years of experience in the field of psychology, with ten years of experience in forensic psychology specifically.  Currently serving both in academia, as Chair of a doctoral program in clinical psychology, as well as a forensic evaluator.  The undersigned has conducted over 1000 forensic evaluations including competency to stand trial, insanity at the time of the crime, diminished capacity, violence risk assessments, and custody placement within the prison and hospital settings.  As providing expert testimony is routine for most criminal forensic evaluators, the undersigned has served to educate and provide an opinion to the court and trier of fact in multiple cases.  In addition, the undersigned conducts active research in the application of cultural competency in forensic evaluations, including the impact of language, worldview, acculturation on the statutory criteria of specific legal questions.  (CV included in the appendices.)

## Referral Question
In mid-July 2018, a representative of the Federal Defenders of San Diego, Inc. requested consultation and applied research regarding the implementation of Operation Streamline (OS) in Southern California.  In early September, an agreement was finalized between the undersigned and the Federal Defenders of San Diego, Inc.  This agreement included observation of court proceedings and interviews with defense attorneys and defendants.  In addition, collaborative consultation with the New York University Immigration Law Clinic was also included in the scope of work.  The final product is a written declaration of findings and conclusory opinions.

## Database & Procedures
Review of various transcripts of prior Streamline hearings – United States v. Mendez-Rodriguez (2018)[2]
Reviewed case law

---

[1] This evaluation and report was completed with the assistance of Kelle Agassiz, Research Fellow at Antioch University Seattle.
[2] United States v. Mendez-Rodriguez, 18-mj-20285-JMA-JLS-1(S.D. Cal.  2018)

CONFIDENTIAL – PRIVILEGED COMMUNICATION                                    2

Interviews with three defendants (November 15 & 16, 2018), including a partial Mental Status Exam[3] and portions of a specialized semi-structured interview, the Evaluation of Competency to Stand Trial-Revised (ECST-R)[4]
Observation of Streamline proceedings, including initial appearance, arraignment, plea, and sentencing (November 15 & 16, 2018)
Interviews with defense attorneys from the Federal Defenders of San Diego (November 15 & 16, 2018)
Informal interview of judge and translator
Review of pertinent psychological literature (references in appendices)

## Findings
*The following is a summary from each of the observations and interviews conducted.*

Observation of Arraignment Hearing on November 15, 2018:

Approximately 15 defendants were escorted into the jury box of the courtroom in street clothes with leg restraints. These defendants reportedly came directly from Border Patrol detention immigration detention facilities. Defendants appeared anxious, disoriented, and confused. Hygiene/grooming marginal with disheveled appearance. Sensorium appeared generally intact for most defendants. Some exhibited wide-eyed stares, not appropriately attending to either the judge or translator. Some demonstrated significant psychomotor agitation (shaking legs, picking at clothes). Attention/concentration appeared impaired. For some, speech expression/reception appeared impaired. Others appeared angry, frequently taking off their translation headsets and talking with each other. Most did not make eye contact with their defense counsel. Most responded to their name, with a few exhibiting some latency. To the short and scripted questions regarding understanding from the judge, all defendants appeared to parrot the previous defendant's response in the affirmative. Based on observations, it appeared that at least some of the defendants did not understand to what they were responding. In addition, the judge used a flat, monotone voice with somewhat scripted narrative that may have an impact on defendant understanding. This is further conflated by language translation.

Observation of Plea Hearing on November 15, 2018:

Approximately 10 defendants were escorted into the jury box, dressed in jail clothing with leg restraints. Most defendants appeared oriented to person, place, time, and situation. Sensorium generally intact. Hygiene/grooming adequate. Appropriate eye contact, tracking the proceedings, looking at either the judge, translator, or defense counsel. Attention/concentration appeared intact for most defendants. Speech expression and reception also appeared intact for most. No overt expressions of anger or resignation apparent.

After perfunctory identification, the judge began a set of close-ended questions to assess knowing/intelligent/voluntary domains. These questions were concrete, close-ended inquiry

---

[3] A Mental Status exam utilizes both inquiry and observation to provide a diagnostic depiction of the individual at the present moment across the domains of cognition, affect, and functioning.
[4] Rogers, Tillbrook, & Sewell (2004). The ECST-R has been designed to assess those mental abilities held to be requirements for competency to stand trial in Dusky v. United States (1960) and subsequent cases.

CONFIDENTIAL – PRIVILEGED COMMUNICATION 3

such as, "Do you understand the charge against you?" and "Have you met with your attorney?" Upon asking the question to the first defendant, the judge did not repeat the question for each subsequent defendant, instead asking, "How about you, Mr. X?". Each defendant provided the same response as the previous defendant. Some appeared surprised and confused when the judge called their name, and seemed to parrot the previous answer. In addition, the judge used a flat, monotone speech with scripted questions that appeared to impair the defendant's ability to track and understand the content. This is further conflated by language translation.

During the submission of pleas, some defendants appeared to be looking at their defense attorney for guidance and reassurance. While there may be a risk of the defendant surrendering their individual choice or being coached by their attorney, it seemed more of an indication of an established attorney/client relationship than an appreciation of legal peril.

Interview with Defendant #1 on November 15, 2018:
*The accuracy of the following information is necessarily limited by the veracity of the defendant's self-report and the linguistic confound. Details provided as relevant to the impact of the confinement and proceedings have on the individual's capacity to make a knowing, intelligent, and volitional plea.*

Preliminary Mental Status Exam – 25-year old male of average stature. Dressed in street clothes, appropriately dressed for the season. Adequate hygiene/grooming. Intermittent but appropriate eye-contact. Sensorium intact. Oriented to person, place, time, and situation. Attention/concentration intact. Speech expression and reception sound in terms of volume, rate, tone, prosody, and articulation. Simultaneous translation service utilized. Reported mood of scared and anxious congruent with his blunted affect. Inferred from the discussion, defendant demonstrated adequate cognitive functioning across the domains of memory, abstraction, judgment, insight, and conceptualization. His estimated intelligence is in the average range based on general fund of knowledge, vocabulary, and level of education.

Defendant reported coming to the United States to live with his maternal grandparents and escape dangerous conditions back home. After being apprehended at the border, he was detained at the immigration holding facility for a few days, then the federal detainment facility (GEO) for approximately two weeks. Confinement conditions at the immigration holding facility described as a 4x15 meter room for 12 people at one time with poor food and lack of conducive sleeping arrangements. He was housed with some criminals that were smuggling drugs and other serious crimes. Defendant did not understand why he was being housed with criminals, as he did not perceive his action as a criminal offense. Common experience was that if an individual was caught crossing the border they would be detained by immigration and sent back across the border. He reported feeling confused but safe during his confinement.

After approximately two weeks at GEO, he was able to gain some clarity from his criminal defense attorney as to the difference between the immigration and criminal proceedings. He had no prior experience with the legal system in the US or back home, so could only make inferences from his limited frame of reference. So far, he has appeared in court three times and reported feeling supported by his attorney. In addition, he reported not remembering much of what was discussed in the first meeting with his attorney and had a difficult time tracking the proceedings of his first court appearance. He stated that it was likely that he would have made an uninformed

and regrettable choice if he was forced to submit a plea during the first court hearing as he was uninformed, emotionally impaired, and fearful of further confinement.

Defendant expressed significant confusion and frustration regarding the new criminal proceedings, as he assumed he would be sent back home if caught crossing the border. He does not perceive himself as a criminal, despite being treated and confined like one. The court process was foreign to him. He reported insomnia due to the anxiety of not knowing what will happen to him. He stated he was not emotionally prepared to be incarcerated. Since being released from GEO, the defendant has been residing at a transitional residential placement that offers more freedom and the opportunity to converse with his attorney.

Despite not having any prior legal experience or education, the defendant displayed a general factual understanding of professional legal roles (judge, prosecution, defense), his criminal charge, appropriate courtroom behavior, and the adversarial nature of the legal system. He did not provide a clear understanding of the specific elements of his crime, the difference between a felony and misdemeanor, possible penalties, implications for his immigration case, or knowledge of other legal options. In addition, the defendant displayed an intact ability to establish effective relationship with counsel. He displayed realistic expectations of his attorney, as well as effective communication skills despite the language barriers, including maintained adequate attention, appropriately shifting from listening to talking, and responding to redirection when necessary.

It appears that the increased opportunity to meet with counsel, more humane living conditions, and segmented court hearings have allowed this defendant to more fully understand the implications of his criminal and immigration cases and make more informed and nuanced decisions. It is likely that if he would have been forced to plead in his first court appearance, he would have made an uninformed and impulsive decision out of fear and significant confusion.

<u>Interview with Defendant #2 on November 16, 2018:</u>
*The accuracy of the following information is necessarily limited by the veracity of the defendant's self-report and the linguistic confound. Details provided as relevant to the impact of the confinement and proceedings have on the individual's capacity to make a knowing, intelligent, and volitional plea.*

Preliminary Mental Status Exam – older male of average stature. Dressed in street clothes, appropriately dressed for the season. Adequate hygiene/grooming. Full and appropriate eye-contact. Sensorium intact. Oriented to person, place, time, and situation. Attention/concentration intact. Speech expression and reception in terms of volume, rate, tone, prosody, and articulation. Consecutive translation service utilized. Reported mood of depressed and hopeless congruent with his flat affect. Inferred from the discussion, defendant demonstrated adequate cognitive functioning across the domains of memory, abstraction, judgment, insight, and conceptualization. His estimated intelligence is in the average range based on general fund of knowledge, vocabulary, and level of education.

Defendant reported living in Chicago with his family for more than twenty years, working as a janitor. His daughter was born in the United States and received an education. Defendant traveled to Mexico to assist the rest of his family, including his son. After approximately three years of residing in Mexico, his son was murdered. Upon the threat of danger on his life, the defendant attempted to cross the border again with the aid of an escort ("coyote"). During this

CONFIDENTIAL – PRIVILEGED COMMUNICATION                    5

process, he reported being kidnapped and exploited by the escort.  Once he was able to cross the border into Texas, the defendant testified against the escort for exchange of immigration benefits.  Somehow, he was then transferred to an immigration holding facility near San Diego, CA.

The defendant spent one night in immigration holding, which he called the "ice box."  He described it as a cold, crowded, concrete square with only an open toilet.  There were no beds, privacy, or decent food.  He slept on the floor and did not know when he would be released.  Others detained at the same time were also scared and confused.  He was then transferred to the GEO federal jail for approximately one week, in which the conditions were much improved with regulated temperature, conducive sleeping conditions, and showers/bathrooms.  He was able to meet with his defense counsel twice during the week.  Yet, at GEO, he reported feeling very scared as he was surrounded by "serious criminals."

The defendant has had three court hearings as of the interview date, with one more scheduled in about a month.  The first hearing addressed "charges and bond," the second for the "plea," and the third for "3rd party custody."  He expressed confusion as to why the bail was set so high ($500), and was very disappointed that he could not join his family in Chicago.  He said there were about 15 defendants during his plea hearing and all of them plead guilty and were deported, he was the exception.  He also stated that he was very satisfied and appreciative of his defense attorney, as she has gone above and beyond in providing assistance.

The defendant expressed significant confusion as to his criminal charge, as he had never heard of this criminal prosecution prior.  He was confined with other serious criminals and did not identify as a criminal and repeatedly asserted innocence with no previous criminal history.  In addition, he stated that he does not understand the difference between the criminal and immigration process.  He was also confused and angry that individuals from El Salvador, Honduras, and Guatemala were granted asylum based on credible fear despite lying, while he is telling the truth and he may be denied.

Regarding the defendant's legal knowledge, he appeared to have a general understanding of professional legal roles (judge, prosecution, defense), his criminal charge, appropriate courtroom behavior, the adversarial nature of the legal system, the difference between a felony and misdemeanor, possible penalties, implications for his immigration case, or knowledge of other legal options.  He also had a basic understanding of incrimination, perjury, and testimony.  He did not provide a clear understanding of the specific elements of his crime.  In addition, the defendant displayed an intact ability to establish effective relationship with counsel.  He displayed realistic expectations of his attorney, as well as effective communication skills despite the language barriers, including maintained adequate attention, appropriately shifting from listening to talking, and responding to redirection when necessary.

Similar to Defendant #1, it appears that the increased opportunity to meet with counsel, more humane confinement conditions, and segmented court hearings have allowed this defendant to more fully understand the implications of his criminal and immigration cases and make more informed and nuanced decisions.  It is likely that if he would have been forced to plead in his

CONFIDENTIAL – PRIVILEGED COMMUNICATION                                    6

first court appearance, he would have made an uninformed and impulsive decision out of fear and significant confusion.

Interview with Defendant #3 on November 16, 2018:
*The accuracy of the following information is necessarily limited by the veracity of the defendant's self-report and the linguistic confound. Details provided as relevant to the impact of the confinement and proceedings have on the individual's capacity to make a knowing, intelligent, and volitional plea.*

Preliminary Mental Status Exam – 29-year old male of average stature. Dressed in street clothes, appropriately dressed for the season. Adequate hygiene/grooming. Sporadic eye-contact. Sensorium intact. Oriented to person, place, time, and situation. Attention/concentration intact. Speech expression and reception in terms of volume, rate, tone, prosody, and articulation. Consecutive translation service utilized. Affect was flat. Responses were concrete and brief, but he responded to further inquiry when needed. Inferred from the discussion, defendant demonstrated adequate cognitive functioning across the domains of memory, abstraction, judgment, insight, and conceptualization. His estimated intelligence is in the average to low-average range based on general fund of knowledge, vocabulary, and level of education.

The defended reported living in the United States for approximately a decade, in California, Idaho, and Montana. He alluded to a previous legal situation that involved a no-contact order and a dismissed misdemeanor. Thus, he has had some prior legal reference. On the current charge, he spent one night in immigration holding, which he called the "ice box," approximately two weeks in federal detention ("GEO"), and most recently two weeks in a transitional community placement. He was able to meet with his attorney multiple times and reports a good relationship with counsel. He has appeared in court three times, for "…the charge, a continuance, and a request for evidence." He stated he understood the proceedings and that he was charged with a felony.

Results of preliminary inquiry into his legal understanding, the defendant demonstrated basic knowledge of professional legal roles (judge, prosecution, defense), his criminal charge, appropriate courtroom behavior, and the adversarial nature of the legal system. Despite prior legal involvement, he did not provide an understanding of the difference between a felony and misdemeanor, possible penalties, implications for his immigration case, incrimination, perjury, the specific elements of the current alleged crime, or knowledge of other legal options. The defendant displayed an intact ability to establish effective relationship with counsel. He displayed realistic expectations of his attorney, as well as effective communication skills despite the language barriers, including maintained adequate attention, appropriately shifting from listening to talking, and responding to redirection when necessary.

Similar to prior defendants, it appears that the increased opportunity to meet with counsel, more humane living conditions, and segmented court hearings have allowed this defendant to more fully understand the implications of his criminal and immigration cases and make more informed and nuanced decisions. Yet, despite prior reference to the United States legal system and considerable consultation with his attorney, the defendant still appears to display a borderline level of legal knowledge. This could be attributed to his general cognitive capacity, his reluctance to disclose and discuss with the undersigned, or personality characteristics. It is unclear if he would meet the knowing/intelligent/volitional standard currently, but it is likely that

if he would have been forced to plead in his first court appearance, he would have made an uninformed and impulsive decision out of fear and significant confusion.

<u>Orientation with Ms. Kara Hartzler on November 15, 2018:</u>

Ms. Hartzler provided a general introduction to Operation Streamline, as well as how the implementation of Operation Streamline has changed, mostly due to the Defender's multiple challenges regarding due process and equal protection, since the summer.

The common sequence of events for an Operation Streamline defendant includes initial detainment by Border Patrol officers in facilities originally meant for short-term, day-long confinement. Confinement conditions, as repeatedly described by different defendants, include cold temperatures (frequently termed "the ice box"), constant light, and minimum food of poor quality, with no beds, private toilets or showers, nor access to medical services. The space is described as a small concrete cell with detainees beyond the maximum capacity limit. After a period of time in these confinement conditions, sometimes for multiple days, the defendant is allowed an initial meeting, usually lasting about half-an-hour, with assigned counsel in the parking garage of a governmental building. This make-shift facility is a grouping of tables and chairs in a noisy parking garage, making attorney-client confidentiality challenging.

Due to these confinement conditions, defendants usually present as disoriented, fatigued, alarmed, and confused. Counsel was often concerned about defendant's cognitive functioning due to sleep deprivation, hunger, and emotional dysregulation. Further, due to the extremity of the confinement conditions, defendants were often much more concerned about further detainment than the specifics of their charge or the implication of their plea. In this way, some attorneys asserted that the confinement conditions themselves were coercive in nature.

The defendants were usually surprised with the notification that they are being charged with a Federal crime, and confused as to the difference between the criminal and immigration court proceedings. Often, the defendants were perplexed as to the role of the criminal defense attorney. Considering the cognitive fatigue, emotional activation, and lack of information the Operation Streamline defendants were experiencing during this initial meeting with counsel in the garage, it is reasonable to assume that half-an-hour was just enough time for introductions and a very general overview of their situation, let alone the specific implications for each individual case.

After this brief meeting with counsel, defendants would attend an expedited court hearing which combined multiple and distinct stages of the legal process into one time and appearance. These proceedings would utilize a Spanish interpreter, or other dialects and languages as indicated by counsel or evidenced by confused behavior in the courtroom. This single hearing combined the initial appearance, arraignment, plea, and sentencing into one compressed 1-1.5 hour long proceeding.

Not only are these Operation Streamline proceedings compressed and expedited, they also process multiple cases at one time. These cases are all § 1325[5] misdemeanants that were

---

[5] 8 U.S.C. § 1325(a).

apprehended at the border in the same period of time. Reported defendant groups ranged from 5-25, with an average of 15 defendants per proceeding. The assigned defense counsel was also present, and depending on their assigned caseload, there might be 4-10 attorneys present to represent the group of defendants. On average, more than 50 defendants would be processed in a day using this compressed and expedited format. This compressed procedural structure persisted from early July to mid-September in San Diego, CA.

Due to recent modifications to the original Operation Streamline process around mid-September 2018, there are no longer same-day plea hearings immediately after detainment at Border Patrol stations. Procedural changes by the court include the offering of bail and temporary release to a 3rd party custodian. In some cases, the Defender's office was able to procure external monetary assistance for bail and local temporary housing options for defendants awaiting proceedings. The result is a process that occurs typically over 4-5 days from initial contact with counsel to conclusory plea and sentencing. In this revised rendition of the Operation Streamline proceedings, the defendant is still detained in Border Patrol stations, provided a brief meeting with assigned counsel, then makes an initial appearance in court for arraignment. Afterwards, most defendants remain in custody in the federal jail or released on bail to a 3rd party custodian and housed at a local transitional community placement. This extended process, relative to the same-day proceedings, provide multiple and more meaningful meetings with counsel which result in a more established factual and rational understanding of the legal process, as well as time to consider the implications of legal decisions. In addition, the respite from the initial aforementioned confinement conditions to those of either the federal jail or transitional placement, provided the defendants increased cognitive functioning and emotional stability.

<u>Interview with multiple defense attorneys from the Federal Defenders office on November 15, 2018:</u>

A group interview was conducted with seven attorneys from the Federal Defenders office. Most were trial attorneys, but some were appellate attorneys. All accounts confirmed the prior account by Ms. Hartzler.

The consensus of the attorneys interviewed was that the current modified court process, resulting in 3-4 additional days in which the defendants are detained in county jail or a local halfway house, increased the individual defendant's capacity for a knowing, intelligent, and voluntary plea. Then attorneys reported that the conditions of the county jail or halfway house were more beneficial for their clients, implying that the conditions and length of confinement of the Border Patrol holding cells resulted in a quality of desperation and disorientation. Some defense attorneys suggested that the detainment conditions were in themselves, coercive, as most defendants were most concerned with avoiding detainment.

Other attorneys reported the general difficulties in the defendant/counsel relationship, including communication, level of education, language, and emotional interference. The majority of defendants have never been involved in the legal system before and have no frame of reference with the legal system of the United States. Most defendants have less formal education, thus a limited vocabulary and language skills. Along with the highly emotional nature of their situation, these factors result in a defendant that is usually confused, emotionally dysregulated,

and desperate. Often, the defendants simply ask counsel to tell them what to do instead of having the capacity to make a reasoned and educated choice themselves. While counsel is, at times, reduced to drawing pictures in order for defendants to understand the legal process in a short period of time.

Defense attorneys reported making every effort to oppose possible constitutional violations due to confinement conditions and the compressed and expedited procedural structure. Common challenges counsel would routinely assert would be equal protections under the law and the lack of a knowing/intelligent/voluntary defendant.

Specific difficulty was reported regarding the plea colloquy, during which time the judge is interacting with the defendant to ascertain the knowing/intelligent/voluntary standard prior to accepting the plea. Often, the defendants will appear disoriented, confused, or even asleep. These obvious visual signs provoke the court to begin a line of questioning, at times questioning the defense counsel as well. Common questions during colloquy include "Do you understand?" and "Did you sleep, were you fed?" After repeated questioning, defense counsel will often request that the court re-word the question or try different questions that are more customized for the individual or situation. While a few judges try, most were reported to refuse to deviate from the standard questions. In addition, the court often asked defense counsel if this plea is made knowing/intelligent/voluntary, connoting that the onus of ascertaining this standard is solely on defense counsel versus a responsibility of the court as a whole. It appears as if the judge is attempting to expedite the process while also avoiding possible grounds for appeal.

### Relevant Literature Review
*Based on the procedural findings reflected above, areas of relevant psychological knowledge were identified as possible impactful factors in considering the legal question. This does not exclude other relevant psychological knowledge from being applied, just that these were the most applicable to the available data set at the time.*

Considering the findings of the observations and interviews, two main areas of concern became apparent when assessing if Operation Streamline defendants meet the legal criteria (knowing/intelligent/voluntary) in Southern California at the time of this report – confinement conditions and the structure of the court proceedings. Areas of psychological research relevant to confinement conditions include those specific to immigration and sleep deprivation. Those relevant to the structure of court proceedings include response set, diffusion of responsibility, and speech reception. The following is a general review of the literature regarding these factors impacting the aforementioned legal criteria.

In 2005, Operation Streamline began with a zero-tolerance approach which permitted the Border Patrol to refer 100 percent of apprehended migrants for prosecution.[6] Over time, the process of Operation Streamline has been expanded throughout the U.S.-Mexico border. Most Operation Streamline defendants are migrants from Mexico or Central America, have no prior criminal convictions, and ultimately attempted to cross the U.S.-Mexico border to be with family or to search for work in the United States. Under Operation Streamline, migrants who cross the border for the first time are prosecuted for misdemeanor illegal entry and any migrant who has been

---

[6] Joanna Jacobbi Lydgate, *Assembly-Line Justice: A Review of Operation Streamline,* 98 Calif. Law Rev. 481 (2010).

deported in the past and attempts to reenter can be charged with felony reentry. With the influx of Streamline prosecutions, defendants appear in court in large groups called en masse proceedings. The way in which these court proceedings are conducted and the state in which the defendants arrive to court allows for many problematic factors to arise.

Furthermore, the court system is overworked and continuously strained by the influx of Streamline prosecutions. The strain placed on the court system by Operation Streamline often prevents defendants from receiving their full constitutional rights. For instance, criminal defense attorneys have less time with each defendant, which decreases the chances that these attorneys will uncover potential issues or defenses. Moreover, en masse proceedings prevent the courts from being able to ask defendants questions individually. Thus, the en masse proceedings of Operation Streamline prevent the courts from assuring that each defendant's response is knowing and voluntary. As the Supreme Court stated in *Stanley v. Illinois,*[7] "The Constitution recognizes higher values than speed and efficiency."[8] Therefore, to assure that Operation Streamline defendants are receiving their full constitutional rights, major changes to the current system must be implemented. A system that completely protects the rights of immigrant criminal defendants comports with justice, as well as humanitarian principles.[9]

*Detainment Conditions/Deportation*
After detainment, inmates undergo an adaptation process, which can influence them on a cognitive level, including concentration and attention problems, short-term memory troubles and mental rumination.[10] Moreover, during this adaptation process inmates can also be impacted on an emotional and somatic level, including anxiety, sadness, affective retreat and aggressiveness, as well as headaches and insomnia.[11] Detainment is a forced situation in which individuals are in a state of submission and stigmatization, these individuals lose the social frame of reference they previously had in the outside world.[12] Thus, being detained encourages acute states of stress, insomnia, permanent traumatic reactivation, and acute psychotic states.[13]
Lengthy detention is a systemic practice that affects nearly all sectors along the southwest border.[14] In addition to long detention periods, the U.S. Commission on Civil Rights[15] also found a lack of compliance with medical standards, including failing to administer proper medical protocols, delaying transfer to a hospital setting, overmedicating detainees, and ignoring serious medical conditions. Moreover, detained immigrant youth are often traumatized but do not receive adequate mental health care.[16]

---

[7] 405 U.S. 645 (1972).
[8] Edith Nazarian, *Crossing Over: Assessing Operation Streamline and the Rights of Immigrant Criminal Defendants at the Border,* 57 Loyola Law Review 1399 (2011).
[9] *Id.*
[10] A. -C Carvalho, B. Lecat & S. Sendas, *Detention Conditions' Impact on Anxiety and Depression Levels of Prisoners,* 66 Eur Rev Appl Psychol 155 (2016).
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] Jamie Longazel, Jake Berman & Benjamin Fleury-Steiner, *The Pains of Immigrant Imprisonment,* 10 Sociology Compass 989 (2016).
[15] United States Commission on Civil Rights, *The State of Civil Rights at Immigration Detention Facilities* (Washington DC: Statutory Enforcement Report,[2015]).
[16] *See* Longazel, *supra* note 9.

Additionally, detainees are often moved from one facility to another, in which important legal paperwork commonly disappears and families lose track of their loved ones. This research highlights a contradiction of immigration law and policy, in which undocumented immigrants are in a position where they are accountable to the law but also excluded from legal rights and protections.[17] These systems reinforce racial hierarchies and further criminalize marginality by directing resources toward confinement and away from social programs.[18] Violations of migrant's rights within immigration detention facilities vary from verbal and physical abuse to failure to return personal belongings or inform migrants of their rights.[19] For example, two reports were issued by the Arizona humanitarian aid organization No More Deaths, which documented more than 30,000 incidents of human rights abuses against undocumented immigrants in short-term detention.[20]

In one study, it was found that people who experienced both prison and immigration detention often reported that immigration detention was worse, due to the uncertainty surrounding their release date, the inability to purchase food from the commissary, and the lack of programming.[21] The impact of criminal stigma follows these individuals after they are deported, where many face stigma due to the association between deportation and criminality.[22] According to the Center for Migration Studies, there were 3.3 million mixed-immigration-status households in the U.S. in 2014.[23] Thus, deportation resulting from Operation Streamline has significant costs for families due to forced family separation, including housing instability, economic hardship, mental and emotional health challenges, and reduced school performance.[24]

*Sleep Deprivation*
Sleep deprivation typically results in various difficulties for the individual, such as poorer cognitive functioning, including alterations in perception, attention, memory, executive functions, and affective processing.[25] The findings of their study showed that sleep loss resulted in reduced alertness, which is necessary to achieve and maintain a state of high sensitivity to incoming stimuli. The authors also found that sleep loss influenced attentional orienting, which is needed to select information from sensory input by allocating attentional focus to a potentially relevant area or object in the visual field.[26]

---

[17] *See* Longazel, *supra* note 9.
[18] *See* Longazel, *supra* note 9.
[19] Catalina Amuedo-Dorantes & Susan Pozo, *On the Intended and Unintended Consequences of Enhanced U.S. Border and Interior Immigration Enforcement: Evidence from Mexican Deportees,* 51 Demography 2255 (2014).
[20] *Id.*
[21] Caitlin Patler & Tanya Golash-Boza, *The Fiscal and Human Costs of Immigrant Detention and Deportation in the United States,* 11 Sociology Compass n/a (2017).
[22] *Id.*
[23] Caitlin Patler & Tanya Golash-Boza, *The Fiscal and Human Costs of Immigrant Detention and Deportation in the United States,* 11 Sociology Compass n/a (2017).
[24] *Id.*
[25] Javier Roca et al., *The Effects of Sleep Deprivation on the Attentional Functions and Vigilance,* 140 Acta Psychol (Amst) 164 (2012).
[26] *Id.*

CONFIDENTIAL – PRIVILEGED COMMUNICATION                                    12

In 2000, a review was conducted which analyzes individuals in the real world who are confronted with prolonged working hours without sleep.[27] The authors argue that divergent skills are particularly affected by sleep deprivation. For instance, sleep deprived participants are less discriminating in handling ambiguous material, less confident, more open to leading remarks, and more willing to modify recollections of a witnessed event.[28] An individual's ability to communicate effectively after sleep deprivation is likely to be negatively influenced by alterations in language processing.[29] Thus, it was observed that qualitative differences in speech articulation after just one night of sleep deprivation occurred. Moreover, sleep deprivation interrupts the vital processes involved in decision making in terms of constructive processing.[30] Therefore, resulting in a lack of focused attention and difficulty in ignoring nonrelevant stimuli which negatively impacts the sleep deprived individual's ability to effectively make decisions.

A meta-analysis was conducted in order to explore the effects of short-term sleep deprivation on both speed and accuracy measures in various cognitive categories, such as simple attention, reasoning, short-term memory, and processing speed.[31] The authors argued that vigilance and sustained attention are fundamentally important to many higher aspects of cognition and that these higher processes will decline if an individual is not able to sustain a sufficient level of vigilance while performing a task. Through their meta-analysis they indicated that short-term total sleep deprivation has a significant detrimental effect across most cognitive domains. More specifically, the authors concluded that tests of working memory and executive attention are strongly affected by one night of sleep deprivation. Lastly, it was indicated that simple attention is the cognitive domain most robustly affected by short-term sleep deprivation.[32]

The effects of sleep deprivation on prospective memory have been explored, which is remembering to execute intended actions in the future.[33] It was found that sleep deprivation impacts cognition globally and that sleep deprivation increases prospective memory failures.[34] An alternative view was offered suggesting that decreased performance after sleep deprivation is caused by variability in arousal and attention.[35] Arousal is necessary for a wide range of cognitive tasks, and thus, sleep deprivation has a more global, unspecific effect on cognition.[36] Therefore, the performance of individuals who are sleep deprived will likely decrease the longer they are awake due to problems of staying alert after sleep loss.[37]

[27] Yvonne Harrison & James A. Horne, *The Impact of Sleep Deprivation on Decision Making: A Review,* 6 Journal of Experimental Psychology: Applied 236 (2000).
[28] Mark Blagrove, *The Effects of Length of Sleep Deprivation on Interrogative Suggestibility,* 2 Journal of Experimental Psychology: Applied 48 (1996).
[29] *See* Harrison, *supra* note 25.
[30] *See* Harrison, *supra* note 25.
[31] Julian Lim & David F. Dinges, *A Meta-Analysis of the Impact of Short-Term Sleep Deprivation on Cognitive Variables,* 136 Psychological Bulletin 375 (2010).
[32] *See* Lim, *supra* note 29.
[33] Tobias Grundgeiger, Ute J. Bayen & Sebastian S. Horn, *Effects of Sleep Deprivation on Prospective Memory,* 22 Memory 679 (2014).
[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] *Id.*

*Diffusion of Responsibility*

Studies of group behavior and decision making reveal that because each group member knows that responsibility for the previous decision is shared among several people, they should each experience fewer feelings of personal responsibility than if they had made the decision alone.[38] Individual behavior is often altered in social contexts, this has been observed in social psychology for quite some time. Diffusion of responsibility is the idea that the presence of others alters the behavior of the individual by causing them to feel less responsible for their actions and the resultant consequences.[39]

The cognitive and neural consequences of diffusion of responsibility were investigated by creating a task where participants either played alone or together with another agent who could act instead of them.[40] The feeling that one can control external events through one's own actions refers to a sense of agency.[41] It was found that participants acted later and rated their feeling of control over action outcomes as lower when paired with another agent, compared to trials where they acted alone.[42] Therefore, it was found that sense of agency and behavioral decisions are continuously updated by social context information.[43] These findings support the idea that negative consequences of an individual's actions are less relevant in a group than in an individual context.[44] And thus, social context may minimize the experience that actions are connected to their consequences.[45]

*Response Set*

The idea of response set was discussed within the context of responding to questionnaires.[46] They suggest that answering questions about attitudes involves five stages: interpretation and determining the appropriate attitude; retrieval of the appropriate beliefs and feelings; applying the beliefs and the feelings to the applicable judgement; mapping the answer onto the response format; and editing the answer for social desirability.[47] A model was proposed which indicates that there are two major stages invoked when responding to questionnaires, the Impression stage and the Expression Response stage.[48] The Impression stage includes information retrieval from various resources, such as values and beliefs or previous experience in order to form an impression. After the information has been retrieved the Expression stage begins where decision making and answer editing occur, which will ultimately be expressed as the actual answers.

---

[38] Glen Whyte, *Diffusion of Responsibility: Effects on the Escalation Tendency,* 76 J. Appl. Psychol. 408 (1991).

[39] Albert Bandura, *Social Cognitive Theory of Self-Regulation,* 50 Organizational Behavior and Human Decision Processes 248 (1991).

[40] Frederike Beyer et al., *Beyond Self-Serving Bias: Diffusion of Responsibility Reduces Sense of Agency and Outcome Monitoring,* 12 Soc Cogn Affect Neurosci 138 (2017).

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] Albert Bandura, *Moral Disengagement in the Perpetration of Inhumanities,* 3 Personality and Social Psychology Review 193 (1999).

[45] *See* Beyer, *supra* note 38.

[46] Boaz Shulruf, John Hattie & Robyn Dixon, *Factors Affecting Responses to Likert Type Questionnaires: Introduction of the ImpExp, a New Comprehensive Model,* 11 Social Psychology of Education 59 (2008).

[47] *Id.*

[48] *Id.*

CONFIDENTIAL – PRIVILEGED COMMUNICATION                                    14

Response sets were identified by Lee J. Cronbach as "any tendency causing a person to consistently give a different response to test items than he would when the same content is presented in a different form."[49] He also discussed two types of response set, including acquiescence, or the tendency toward agreement or disagreement, and overgeneralization.[50] It was Allen Edwards that related response sets to social desirability and social norms, such as the tendency to endorse socially desirable or socially undesirable statements about oneself.[51] Individuals are embedded in a cultural context, and thus, the individual may be more attuned to a collectivist or individualist disposition.[52] Further, there is accruing evidence that cultural attributes such as collectivism and individualism can affect responses to questionnaire. Under a socioanalytic view, faking one's response is indicative of social skills because an individual must know the standards of their group and they must be aware of the reputation they hold in their social group, as well as how to represent themselves in order to maintain it.[53] Thus, individuals seek to portray themselves in a manner consistent with their reputation.

*Prosody/Rate of Speech/Listening Effort/Social Perception*
The tonal quality of speech, also known as prosody, can modify the meaning of utterances. More specifically, affective prosody refers to the affective connotation attributed to a word or a sentence during speech.[54] This is also called the "the tone of voice", which includes cues such as intensity, intonation, and timing that communicate stress, emotional reaction, or state of the speaker.[55] Comprehension of information expressed by the tone of voice is highly important for successful social interactions.[56] Data was collected from groups of adults in order to explore emotional prosody effects on information processing and verbal memory.[57] Through their review of the literature, the authors discuss how affective information is generally processed and remembered better than neutral information in adults.[56]

Groups of adults were examined when listening to extended discourse (10 to 15 minute lectures) speeded to a rate near the limit of normally encountered fast speech.[58] After listening to the lecture, the authors tested the listener's comprehension and memory regarding the details discussed in the lecture, their ability to integrate the information and draw appropriate inferences. It was found that both groups of adults had more difficulty recalling the details of the discourse and integrating their contexts when stimuli were presented at faster rates and in higher levels of background noise.[59]

---

[49] Lee J. Cronbach, *Response Sets and Test Validity,* 6 Educational and Psychological Measurement 475 (1946).
[50] *Id.*
[51] Allen L. Edwards, The Social Desirability in Personality Assessment and Research (2nd ed. ed. 1957).
[52] *See* Shulruf, *supra* note 44.
[53] 7. Philippe Bou Malham & Gerard Saucier, *The Conceptual Link between Social Desirability and Cultural Normativity,* 51 International Journal of Psychology 474 (2016).
[54] Beth Fairfield et al., *Emotional Prosody Effects on Verbal Memory in Older and Younger Adults,* 24 Neuropsychol Dev Cogn B Aging Neuropsychol Cogn 408 (2017).
[55] *Id.*
[56] Dirk Wildgruber et al., *A Cerebral Network Model of Speech Prosody Comprehension,* 11 Int J Speech Lang Pathol 277 (2009).
[57] *See* Fairfield, *supra* note 52.
[56] *See* Fairfield, *supra* note 52.
[58] *See* Fairfield, *supra* note 52.
[59] *Id.*

CONFIDENTIAL – PRIVILEGED COMMUNICATION                                    15

Listening effort can be described as the cognitive resources necessary to understand speech.[60] The authors offer the model of Ease of Language Understanding, which provides a conceptual framework for listening effort. This model states that understanding language involves both implicit and explicit processing. Therefore, listeners automatically and quickly bind language segments and compare them to long-term memory stores. During this process, speech recognition will be reached with minimal effort when there is an easy match between language input and long-term memory. Although, when there is a mismatch and a signal is degraded, a listener must rely on explicit processing and other cognitive resources in order to understand speech. Thus, listening effort is increased when speech signals are degraded.[61]

The cognitive abilities necessary for social perception have been investigated.[62] The human ability to infer mental states of others involves cognitive and perceptual processes, which can be implicit and explicit. Implicit processes involve the decoding of socially pertinent information transmitted through facial expression, voice, and body motion.[63] The explicit processes involve cognitive skills such as higher-order reasoning and language. The authors' results show that social-perceptual and cognitive processes involved in the representation of socially pertinent information are important predictors of individual differences in the ability to infer emotional and mental states of others from noticeable cues, including faces, eyes, spoken language and prosody.[64]

The role of attention is important in auditory scene analysis.[65] Auditory scene analysis is a primary skill of the auditory system that permits us to identify and perceive sound events in the environment. Perceptual ambiguity can arise when there are overlapping sound sources. The auditory system resolves perceptual ambiguity by allowing attended input to dominate over unattended input, in that attended information is enhanced and unattended information is suppressed.[66] Moreover, information about the auditory scene is not lost when selecting a subset of information, and thus, the capacity to retrieve information is permitted by this flexibility. For instance, when we do not originally hear what we wanted to listen to and had to retrieve from memory the trace of the original source. This ability allows for flexible and quick attention switching, which is necessary in noisy environments in order to facilitate the ability to listen to various sound events in the environment.[67] For example, at a cocktail party one may know that there are other speakers in the background, with the pitch of the voices signifying male and female, but not being able to perceive the content of any unattended speech stream among background speakers. Thus, the level of processing which occurs passively segregates the sounds to sources, but the processing is limited by attentional resources required to make meaning of the various events.[68]

---

[60] Erin M. Picou, Lauren M. Charles & Todd A. Ricketts, *Child–adult Differences in using Dual-Task Paradigms to Measure Listening Effort,* 26 Am. J. Audiol. 143 (2017).
[61] *Id.*
[62] Bozana Meinhardt-Injac et al., *The Two-Systems Account of Theory of Mind: Testing the Links to Social-Perceptual and Cognitive Abilities,* 12 Front Hum Neurosci (2018).
[63] *Id.*
[64] *See* Meinhardt-Injac, *supra* note 61.
[65] Elyse S. Sussman, *Auditory Scene Analysis: An Attention Perspective,* 60 J. Speech Lang. Hear. Res. 2989 (2017).
[66] *Id.*
[67] *Id.*
[68] *Id.*

## Opinion

*The following section is a synthesis of the procedures, findings, and relevant psychological research, along with the experience and clinical expertise of the undersigned.*

Two main areas of consideration are provided here to address the referral question regarding the capacity for defendants in the current Operation Streamline proceeding to meet the legal criteria for knowing/intelligent/voluntary standard – confinement conditions and the structure of court proceedings.

As demonstrated from the brief literature above, confinement conditions and related sleep deprivation have a clear and undeniable negative impact on the cognitive, emotional, and physical capacities of an individual. These include decreased and impaired sensory perception, attention/concentration, mental rumination, prospective and short-term memory, information-processing, headaches and insomnia, suggestibility, lack of critical thought, speech articulation, and processing speed. Further, the psychological impacts of confinement can lead to acute stress reactions, clinical levels of trauma, and possibility acute psychosis. All of these factors can directly impact and impair a defendant's ability to provide a knowing/intelligent/voluntary plea during an Operation Streamline proceeding.

This research has a direct implication and application to the defendants described, observed, and interviewed during this project. Observations included signs and symptoms synonymous with those described in the available literature. Specifically, conditions of the immigration holding facilities appear to have the most profound impact on defendants and there was a marked difference between the observed condition of defendants whom had just been transferred from the immigration facilities versus those from the federal detention centers. This does not negate the impact that general detainment also has on individuals as demonstrated in the research above.

Regarding the structure of legal proceedings, it is important to note that a main feature of Operation Streamline is to prosecute as many defendants as possible in the least amount of time. Thus, the original expedited and condensed hearings with multiple defendants at once. The current segmented proceedings that are tentatively in place are due to the efforts of the Defenders Association and community resources, reflecting a more common course and pace of legal proceedings, and affording the defendants to recover from immigration holding confinement and consult with counsel. The observations and interviews conducted were done under the current and tenuous segmented process. The impact of the expedited and condensed design can only be inferred.

One of the distinguishing features that characterizes Operation Streamline proceedings is multiple defendants in a condensed, abbreviated hearing format as observed and reported by multiple sources in the available data above. The established field of Social Psychology has long established a foundational concept of diffusion of responsibility. This concept, briefly described above, highlights a major difference when an individual is acting alone or as a group. Namely, individuals within a group context are much more likely to suspend critical thinking or a sense of individual responsibility, deferring to the consensus or dominance of the group itself. In an Operation Streamline context, while each of the defendant's cases are supposedly handled individually but at the same time, the result appears to be one of group process and dominance.

Specific examples being in the inquiry/response cycle of the proceedings observed, in which the judge asks various short, concrete, and close-ended questions directed at the first defendant. Then simply follows up with the name of the subsequent defendants, prompting an answer to the original question. Considering the average number of defendants are approximately 15-20, and applying the concept of responsibility diffusion, the individual defendants are more likely to answer in line with the rest of the group. In the observed proceedings, all defendants answered in the exact same manner, responding "yes," to questions such as "Mr. X, do you understand?" or "Mr. X, how to you plead?"

A related psychological concept is that of response set, in which individuals are more likely to respond in the same way to a series of related questions. Further, social desirability and conformity magnetize the individual's responses either in the affirmative or negative. Applying this concept to the aforementioned dynamic of inquiry during the observed proceedings, all defendants answered in the affirmative, repeatedly. Here again, the impact of combining individual legal cases into one proceeding appears to undermine the individual's critical thought, unique considerations, and volitional action. Further, the multiple defendant structure can trigger the dynamics established in responsibility diffusion and response set that could interfere with the defendant's capacity for a knowing, intelligent, and voluntary plea. Furthermore, it can be inferred that if expedited and condensed proceedings recommence, along with direct transfer from immigration holding facilities, these psychological forces will become exponentially more derogating to the defendant's capacities during the legal process. These capacities include both the Dusky[68] prongs and the knowing, intelligent, and voluntary criteria.

Also identified in courtroom observations was the flat and monotone speech of the judge using an almost scripted narrative during the proceedings. Simultaneous translation was also utilized and all defendants observed use the headsets during the proceedings. The available literature indicates that language lacking natural prosody, as well as noise interference, can interfere with an individual's ability to attend, track, and comprehend the content and meaning. While this factor in and of itself does not necessarily sabotage legal competency, in combination with the factors of confinement conditions and multiple defendant format, these issues of speech and noise appear to be a compounding and interfering concern.

The undersigned has completed over 1000 forensic evaluations, with many calling for expert testimony in contested hearings, or bench and jury trials. The Operation Streamline proceedings contain many aspects that have never been witnessed by the undersigned. These aspects include the condensed and expedited hearing structure, the multiple defendant format, misdemeanants in restraints, defendants disoriented and distracted due to other than a psychiatric condition, the disregard for the unique and distinct aspects of each case, or the lack of effort and diligence in the court colloquy regarding the defendant's understanding. Each of these defendants come from differing geographic locations, with unique reasons for seeking citizenship or asylum, and individual characteristics and resources. Thus, the implications of this charge, albeit the same charge across defendants, have very different consequences for each individual defendant. Thus, no two cases are the same and demand the specific attention of the court. While the more segmented hearings with more time to consult with counsel are mitigating steps to ensure the

---

[68] Dusky v. United States, 362 U.S. 402 (1960)

CONFIDENTIAL – PRIVILEGED COMMUNICATION                    18

legal capacities of the defendants, it in no way rectifies the problem inherent in the policies of Operation Streamline.

This report is complete upon submission of the document as of January 28, 2019.

Jude Bergkamp, Psy.D.
Core Faculty - Antioch University Seattle, School of Applied Psychology
Program Chair - Psy.D. Doctorate in Clinical Psychology (APA-approved), Antioch University Seattle
Clinical Faculty - The University of Washington, Department of Psychiatry & Behavioral Sciences
Forensic Evaluator - Washington State Office of Forensic Mental Health Services
jbergkamp@antioch.edu
360.790.2033
2400 3rd Avenue, Suite 200
Seattle, WA 98121

Appendix A

1. Catalina Amuedo-Dorantes & Susan Pozo, *On the Intended and Unintended Consequences of Enhanced U.S. Border and Interior Immigration Enforcement: Evidence from Mexican Deportees,* 51 Demography 2255 (2014).

2. Albert Bandura, *Moral Disengagement in the Perpetration of Inhumanities,* 3 Personality and Social Psychology Review 193 (1999).

3. ———. , *Social Cognitive Theory of Self-Regulation,* 50 Organizational Behavior and Human Decision Processes 248 (1991).

4. Frederike Beyer et al., *Beyond Self-Serving Bias: Diffusion of Responsibility Reduces Sense of Agency and Outcome Monitoring,* 12 Soc Cogn Affect Neurosci 138 (2017).

5. Mark Blagrove, *The Effects of Length of Sleep Deprivation on Interrogative Suggestibility,* 2 Journal of Experimental Psychology: Applied 48 (1996).

6. ———. , *Interrogative Suggestibility - the Effects of Sleep Deprivation and Relationship with Field-Dependence,* 8 Applied Cognitive Psychology 169 (1994).

7. Philippe Bou Malham & Gerard Saucier, *The Conceptual Link between Social Desirability and Cultural Normativity,* 51 International Journal of Psychology 474 (2016).

8. A. -C Carvalho, B. Lecat & S. Sendas, *Detention Conditions' Impact on Anxiety and Depression Levels of Prisoners,* 66 Eur Rev Appl Psychol 155 (2016).

9. Lee J. Cronbach, *Response Sets and Test Validity,* 6 Educational and Psychological Measurement 475 (1946).

10. Allen L. Edwards, The Social Desirability in Personality Assessment and Research (2nd ed. ed. 1957).

11. Beth Fairfield et al., *Emotional Prosody Effects on Verbal Memory in Older and Younger Adults,* 24 Neuropsychol Dev Cogn B Aging Neuropsychol Cogn 408 (2017).

12. Michael S. Gordon, Meredyth Daneman & Bruce A. Schneider, *Comprehension of Speeded Discourse by Younger and Older Listeners,* 35 Exp. Aging Res. 277 (2009).

13. Tobias Grundgeiger, Ute J. Bayen & Sebastian S. Horn, *Effects of Sleep Deprivation on Prospective Memory,* 22 Memory 679 (2014).

14. Yvonne Harrison & James A. Horne, *The Impact of Sleep Deprivation on Decision Making: A Review,* 6 Journal of Experimental Psychology: Applied 236 (2000).

15. Julian Lim & David F. Dinges, *A Meta-Analysis of the Impact of Short-Term Sleep Deprivation on Cognitive Variables,* 136 Psychological Bulletin 375 (2010).

16. Jamie Longazel, Jake Berman & Benjamin Fleury-Steiner, *The Pains of Immigrant Imprisonment,* 10 Sociology Compass 989 (2016).

17. Joanna Jacobbi Lydgate, *Assembly-Line Justice: A Review of Operation Streamline,* 98 Calif. Law Rev. 481 (2010).

18. Bozana Meinhardt-Injac et al., *The Two-Systems Account of Theory of Mind: Testing the Links to Social-Perceptual and Cognitive Abilities,* 12 Front Hum Neurosci (2018).

19. Edith Nazarian, *Crossing Over: Assessing Operation Streamline and the Rights of Immigrant Criminal Defendants at the Border,* 57 Loyola Law Review 1399 (2011).

20. Caitlin Patler & Tanya Golash-Boza, *The Fiscal and Human Costs of Immigrant Detention and Deportation in the United States,* 11 Sociology Compass n/a (2017).

21. Erin M. Picou, Lauren M. Charles & Todd A. Ricketts, *Child–adult Differences in using Dual-Task Paradigms to Measure Listening Effort,* 26 Am. J. Audiol. 143 (2017).

22. Javier Roca et al., *The Effects of Sleep Deprivation on the Attentional Functions and Vigilance,* 140 Acta Psychol (Amst) 164 (2012).

23. Boaz Shulruf, John Hattie & Robyn Dixon, *Factors Affecting Responses to Likert Type Questionnaires: Introduction of the ImpExp, a New Comprehensive Model,* 11 Social Psychology of Education 59 (2008).

24. Elyse S. Sussman, *Auditory Scene Analysis: An Attention Perspective,* 60 J. Speech Lang. Hear. Res. 2989 (2017).

25. States United, on Commission and Rights Civil, *The State of Civil Rights at Immigration Detention Facilities* (Washington DC: Statutory Enforcement Report,[2015]).

26. Glen Whyte, *Diffusion of Responsibility: Effects on the Escalation Tendency,* 76 J. Appl. Psychol. 408 (1991).

27. Dirk Wildgruber et al., *A Cerebral Network Model of Speech Prosody Comprehension,* 11 Int J Speech Lang Pathol 277 (2009).

CONFIDENTIAL – PRIVILEGED COMMUNICATION                                        21

Appendix B

# JUDE BERGKAMP, PSY.D., M.A.

Phone: (360)-790-2033                                                    2400 3rd Ave #200
jbergkamp@antioch.edu                                                Seattle, WA  98121

## Education

| | | |
|---|---|---|
| **PsyD** | Antioch University Seattle; Forensic & Neuropsychology<br>Dissertation: The Paradox of Multicultural Training | September 2010 |
| **MA** | Antioch University Seattle; Couple & Family Therapy | September 1998 |
| **BA** | The Evergreen State College; Violence & Addiction Studies | July 1996 |

## Academic Experience

**Antioch University**, Seattle, WA                          September 2015 - Present
**Program Chair**, Doctorate in Clinical Psychology
- Achieved American Psychological Association accreditation in 2017 for a 5-year term
- Budgetary, staffing, admissions, and disciplinary oversight
- Revised program policies, curriculum, and faculty staffing to meet accreditation standards
- Supervision of faculty, staff, fellows, and graduate assistances
- Ensure on-going compliance with accreditation standards

**Antioch University**, Seattle, WA                          September 2012 - Present
**Core Faculty**, Doctorate in Clinical Psychology
- Design and implement courses in social justice, cultural competency, psychological assessment, and qualitative research methods
- Provide clinical supervision to doctoral students
- Academic advising and professional mentorship
- Chair dissertations specializing in Grounded Theory research methodology, cultural competency, forensic psychology, and virtual avatar identity development
- Serve as Chair of Institutional Academic Council to ensure academic rigor
- Serve on the Institutional Review Board reviewing research proposals
- Organize and facilitate the first institutional Social Privilege faculty group

**University of Washington**, Seattle, WA                          March 2012 - Present
**Clinical Faculty**, School of Psychiatry
- Serve on the post-doctoral Forensic Fellowship Committee at Western State Hospital
- Provide didactic trainings to Western State Hospital clinicians and University of Washington graduate students

- Supervise psychiatry residents in forensic assessment with an emphasis on cultural competency
- Participate in the University of Washington Faculty of Color advocacy and research project

**Highline Community College**, Des Moines, WA                    August 1998 – June 2006
**Adjunct Faculty**, Department of Psychology
- Design and implement curriculum or original classes in family violence, assessment & advocacy, adolescent development, and human sexuality.

## Professional Experience

**Washington State Office of Forensic Mental Health**           February 2011 - Present
**Forensic Evaluator**, Western State Hospital
- Conduct pre-trial criminal evaluations including competency to stand trial, insanity at the time of the crime, and diminished capacity
- Conduct comprehensive risk assessments regarding violence and recidivism
- Conduct civil commitment evaluations from forensic and civil units
- Consult with the Western State Hospital Risk Review Board and the Washington State Public Safety Review Panel
- Serve on the Western State Hospital psychology internship committee
- Provide consultation on issues of cultural competency in forensic evaluations

**Washington State Department of Corrections**                 April 2010 – February 2011
**Psychology Associate**, McNeil Island; Shelton Intake; DOC Headquarters
- Conduct psychological assessments regarding violence and recidivism risk, cognitive functioning, vocational rehabilitation, psychiatric diagnosis, and educational placement
- Crisis assessment and intervention services in the Suicide Observation Unit and the Intensive Management Unit
- Provide on-going training to clinical, classification, and custody staff regarding suicide and serious mental illness
- Consult with institutional administration regarding psychological services
- Provide specialized consultation to the Department of Corrections Executive Leadership Team regarding cultural competency in organizational policy and practice
- Innovate, revise, and implement a systemic policy change regarding integrated behavioral health across the department
- Provide Defensive Tactic training to medical staff

**The Family Project**, Olympia, WA                              May 1998 – June 2009
**Co-Founder & Co-Director**, C.I.E.L.O.
- Co-founded a non-profit agency that provides comprehensive, culturally competent family therapy under state and federal contracts
- Develop and monitor budget for board approval
- Contract and insurance acquisitions
- Design and maintain billing and payment systems

CONFIDENTIAL – PRIVILEGED COMMUNICATION                    23

- Ensure on-going contract compliance
- Manage clinical and administrative staff
- Continuous relationship to governing board, agency affiliates, and external stakeholders

**North Thurston School District**                          May 2001 – March 2008
**Mediation & Anger Management Specialist**, Timberline High School
- Design model of mediation and therapy services embedded in public high schools
- Provide mediation services to supplement administrative discipline
- Provide emotional regulation focused therapeutic services to students and staff
- Develop educational workshops for staff and administration
- Assist in district policy regarding harassment, intimidation, and bullying
- Provide on-going consultation to staff and administration

**St. Martins University**, Lacey, WA                          July 2006 – June 2009
**Mental Health Therapist**, Counseling & Wellness Center
- Provide assessment and therapeutic services to students and their families
- Serve on the Students of Concern committee
- Serve as advisor to student organizations
- Provide consultation to faculty and staff

**Hoy & Nickle Associates**, Olympia, WA                          May 1998 – June 2002
**Sex Offender Treatment Provider**
- Provide therapeutic services for adjudicated sex offenders in Thurston County
- Strong collaboration with probation officers, the courts, and peripheral therapy providers
- Receive supervision and consultation in sex offender treatment modalities

**Jade Counseling Center**, Olympia, WA                          May 1997 – March 2002
**Domestic Violence Perpetrator Treatment Provider**
- Co-facilitated a treatment program for domestic violence perpetrators focused on ensuring victim safety
- Collaboration with Victims' Advocates, probation officers, and court officials

**Clinical Training & Internships**

**Washington State Department of Corrections**                          June 2009 – April 2010
Supervisor – Deborah Wentworth, Ph.D.
- Trained in a wide variety of personality, forensic, and neuropsychological assessment measures
- Individual and group psychotherapy
- Participation in routine supervision and professional training
- Collaborative member of medical and correctional multidisciplinary teams
- Rotations in the outpatient mental health, acute mental health, medical ward units, and correctional administration

**Outpatient Neuropsychology Services**, Olympia, WA                          May 2008 – June 2009
Supervisor – Laura Dahmer-White, Ph.D.

CONFIDENTIAL – PRIVILEGED COMMUNICATION                          24

- Participation in full assessment process including initial interview, collateral consultation, assessment battery administration, report writing, and feedback session
- Trained in neuropsychology assessment measures and practices
- Attended ongoing didactic training in neuropsychology theory and innovation

**Comprehensive Parenting Evaluations**, Olympia, WA          May 2008 – June 2009
Supervisor – Griselda Perretz-Rosales, Ph.D.
- Research, development, and implementation of a comprehensive parenting assessment protocol under supervision
- Contract negotiations with the Washington State Department of Social & Health Services

**First Place Therapeutic Child Center**, Tacoma, WA          May 1997 - 1999
**Pediatric Mental Health Therapy Intern**
- Provided play therapy to children 2-7
- Parent education using one-way mirror and bug-in-ear technology
- Consultant to center director on program curriculum and design
- Facilitated staff education presentations and workshops
- Specialized supervision from Elaina Gil and Toni Cavanaugh-Johnson

**Family & Child Guidance Center**, Tacoma, WA          June 1996 – July 1998
**Therapy Intern**
- Attachment assessments for Department of Child & Family Services
- Therapist in specialized program for intercity adolescents involved in gangs (G.R.I.P.S.)
- Individual, couple, and family therapy with a wide array of clientele
- Weekly didactic sessions
- Co-facilitated parenting groups
- Designed and implemented after school family nights with child and parent education components
- Supervision and consultation

**The Evergreen State College**, Olympia, WA          May 1995 – June 1996
**Therapy Intern,** Counseling & Wellness Center
- Individual and couple therapy for college students and their families
- Weekly didactic sessions
- Weekly consultation and supervision

**Honors and Awards**

**Diversity Scholarship Award**
**National Counsel of Schools of Professional Psychology**          2018

**Distinguished Alumni of the Year Award**
**Antioch University Seattle**          2018

**Minority Research Fellowship**
**American Psychological Association, Division 45**          2010

CONFIDENTIAL – PRIVILEGED COMMUNICATION                                    25

- One of nine national fellows tasked with presenting research on minority health disparities, mental health parity, health care reform, and the role of psychology in public policy
- Advocacy at a state and federal level
- Pipeline relationship with national and federal funding agencies such as the National Institute for Health, The Robert Woods, and William T. Grant Foundations

**Research & Teaching Fellowship**
**Antioch University Seattle**                                                    2007
- Assistant in graduate-level classes that include intelligence assessment, neuropsychology, and quantitative methods
- Assist in program alignment with the American Psychological Association accreditation committee
- Conduct research on the use of electronic portfolios to ensure professional competencies in a graduate program

## Publications

Bergkamp, J. & Agassiz, K. (2018). Cultural competency in forensic practice: Bridging the Divide. The American Psychology & Law Society Expert Opinion, Quarterly Newsletter. (http://apls.wildapricot.org/resources/EmailTemplates/2018_09%20September%20AP-LS%20Newsletter/ExpertOpinion9_18.pdf).

Bergkamp, J. & Ermann, K. (In Press). Biracial and multiracial individuals. In the Wiley Encyclopedia of Personality and Individual Difference, Volume IV: Clinical, Applied, and Cross-Cultural Research. Wiley-Blackwell Publishing.

Bergkamp, J. & Ponsford, M. (In Press). Cultural encapsulation. In the Wiley Encyclopedia of Personality and Individual Difference, Volume IV: Clinical, Applied, and Cross-Cultural Research. Wiley-Blackwell Publishing.

## Media

Bergkamp, J. (Contributor). (2018, July). *Race in America: Facing the divide* [Video file]. From https://www.apa.org/education/undergrad/diversity/default.aspx.

## Doctoral Dissertations

McNichols, C. (2015). Can a culturally adapted form of CCI treatment model be effective in treating Aboriginal families affected by trauma?: A participatory action project.

Armstrong, V. (2016). Black & white multiracial adult women's experience of their physical appearance: A qualitative descriptive phenomenological analysis.

Ponsford, M. (2016). The mutual interaction of online & offline identities in massive multiplayer online games: A grounded theory of EVE online players.

Mucci, N. (2016). Program evaluation of on-site psychosocial services at a cancer treatment facility.

Sidhu, G. (2017). The application of western model of psychotherapy by Indian psychotherapists in India: A grounded theory.

Stark, J. (2017). Making meaning of video game avatars and behavior: A phenomenological exploration.

Sveund, J. (2017). The experience of Qigong among women who have lived with cancer.

Shreeve, S. (2018). Case study of the four-year neuropsychological changes in an elderly male with chronic traumatic encephalopathy.

## Presentations and Invited Lectures

Thomas, L., & Bergkamp, J. (2018). *Introductory Social Pedagogy in a Clinical Psychology Training Program.* The Race & Pedagogy Conference at the University of Puget Sound.

Thomas, L., Martin, A., Bergkamp, J., Babcock, M. (2018). *Exploring the Path of Least Resistance: A Grounded Theory Study of Privilege Awareness and Implications for Education*. The American Psychological Association Convention; Division 2.

McGee, S., Kinnamon, C., Nipper, A., Wells, K. & Bergkamp. J. (2018). *Western Clinical Psychology Student's Exploration of Cultural Immersion: The Intersection of Tibetan Buddhism and Psychology.* The American Psychological Association Convention; Division 36.

Thomas, L., Martin, A., Bergkamp, J., Babcock, M. (2018). *Exploring the Path of Least Resistance; A Ground Theory Study of Privilege Awareness.* The American Psychological Association Convention; Division 9.

Martin, A., Thomas, L., Bergkamp, J., Babcock, M. (2018). *Privilege Awareness through the Lens of Intersecting Social Identities*, The Asian American Psychological Association Annual Conference.

Bergkamp, J. (2018). *Precedent case-law in Washington State: A call for cultural competency in forensic evaluations*. The American Psychology-Law Society Graduate Student Symposium.

Bergkamp, J. & Thomas, L. (2018). *Social Privilege in Clinical Psychology*. The Deschutes Psychological Association Symposium.

Bergkamp, J. & Curtis, S. (2018). *Case Law and Cultural Competency in Competency to*

*Stand Trial Evaluations: Pragmatic Application*. The American Psychology-Law Conference.

Bergkamp, J. (2017). *Avatar Identity Development: What Video Games tell us about Ourselves.* The American Psychological Association Convention; Division 46.

Barnhart, G. & Bergkamp, J. (2017). *Voir Dire Juror Personality Matrix: Predictors of Personality Traits*. The American Society of Jury Consultants.

Bergkamp, J. (2017). *Cultural Competency in Forensic Evaluations: Case Studies of the Jinni*. The University of Washington Post-Doctoral Fellowship Seminar.

Bergkamp, J. & Hendrickson, R. (2016). *Malingering Misperceptions; Clinical Application of Forensic Malingering.* The Washington State Behavioral Healthcare Conference.

Bergkamp, J. (2015). *Virtual Identity Development; Videos games and the Self*. The Qualitative Quorum of the University of Washington Office of Research.

Bergkamp, J. (2015). *Classic Glasserian Grounded Theory*. The Qualitative Quorum of the University of Washington Office of Research.

Bergkamp, J. & Means, J. (2015). *Principles of Risk and Threat Assessment*. Seattle Children's Hospital for the Washington State Council of Child & Adolescent Psychiatry.

Bergkamp, J. (2015). *Cultural Competency Guidelines for Court Appointed Special Advocates (CASA).* The King Count Family Law Center.

Bergkamp, J. & Curtis, S. (2014). *Cultural Competency in Forensic Private Practice: From Aspiration to Reality.* The Washington State Psychological Association.

Bergkamp, J., Nelson, J., Cooke, T., & Tien, L. (2012). *Does Doctoral-level Cultural Competency Curriculum Work & How?* The Washington State Psychological Association.

Bergkamp, J. & Hendrickson, R. (2012). *Forensic Evaluations; What Happens After CSI*. The Washington State Behavioral Healthcare Conference.

Bergkamp, J. & Bjorling, E. (2012). *Avatar Development in Second Life; Implications for First Life*. The Giving Voice to Experience Conference at Seattle University.

Bergkamp, J. (2012). *Cultural Competency in Professional Psychology Training; What Works and What Doesn't*. The Western State Hospital Internship Seminar Series.

Bergkamp, J. (2011). *Organizational Cultural Competency in Social Service Agencies*. The Washington State Department of Social and Health Services - Office of Diversity Affairs.

CONFIDENTIAL – PRIVILEGED COMMUNICATION                                    28

Bergkamp, J. (2011). *Recommitting to Organizational Cultural Competency*. The Washington State Behavioral Healthcare Conference.

Bergkamp, J. & Gage, B. (2011). *Borderline Personality Disorder: Seeking a Cure or Behavior Change*. The Washington State Behavioral Healthcare Conference.

Bergkamp, J. (2011). *Cultural Competence in Correctional Mental Health*. The Women in Corrections Conference.

Bergkamp, J. (2010). *Crisis Intervention Skills with Mentally Ill Offenders*. The Criminal Justice Training Commission of Thurston County Annual Conference.

Bergkamp, J. (2010). *Organizational Cultural Competency: Measurement & Outcomes*. The Washington State Department of Corrections Executive Leadership Board.

Bergkamp, J. (2010). *Introduction of a New Curriculum for Cultural Competency*. The American Psychological Association Convention; Division 45.

Bergkamp, J. & Bjorling, E. (2010). *Bridging First and Second Life: An Ethnography*. The American Psychological Association Convention; Division 46.

Bergkamp, J., Periera, C. (2010). *The Business of Group Private Practice: A Phenomenological Design*. The American Psychological Association Convention; Division 42.

Bergkamp, J. (2010). *Cultural Competency in Correctional Mental Health*. The Washington State Behavioral Health Conference.

Bergkamp, J. & Bjorling, E. (2010). *Minority Perceptions of Stress & Pain*. The American Psychosomatic Association Conference.

Bergkamp, J. & Jones, K. (2009). *Stress & Wellness of Psychology Graduate Students*. The American Psychological Association Convention; Early Psychologist Committee.

Bergkamp, J. & Tien, L. (2009). *An Emerging Paradigm in Multicultural Competency Training*. The "Giving Voice to Experience" Conference at Seattle University.

Bergkamp, J. & Jones, K. (2008). *How Stressed are Graduate Students?* The Washington Psychological Association Annual Conference.

Bergkamp, J. (2006). *Innovations in Mindfulness & Therapy*. Keynote for the Southwestern Washington Association of Behavioral Health.

Bergkamp, J. (2005). *Comparison of Western Psychology & Buddhist Philosophy*. Invited Address at the International Buddhist Academy – Nepal.

CONFIDENTIAL – PRIVILEGED COMMUNICATION                                29

## Licenses & Certifications

- Licensed Psychologist, Washington State since August 2011 - #PY60186543.
- Licensed Mental Health Counselor, Washington State since February 2007 - #LH00010918.
- Dissertation Consultant, The Grounded Theory Institute.
- Senior Mediator, Thurston County Conflict Resolution Center.

## Professional Affiliations

- American Psychological Association
    - American Psychology-Law Society; Division 41
    - Society for the Psychological Study of Culture, Ethnicity, and Race; Division 45
    - Society of Consulting Psychology; Division 13
- Washington State Psychological Association
- American Academy of Forensic Psychology
- Pacific Northwest Neuropsychological Society
- American Psychosomatic Association
- American Association of Marriage & Family Therapy
- National Board of Certified Counselors
- Southwestern Washington Association of Behavioral Health
- Deschutes Psychological Association
- Association for Mindfulness in Education

## Clinical Pro-Bono Service

**Offender Re-entry Community Safety Program**                  March 2015 - Present
**Committee Advisor**
- Serve as advisory consultation regarding risk assessment
- Assist with policy decisions regarding rater bias
- Provide program evaluation insights regarding service delivery

**Choice Regional Health Network**, Lacey, WA                  May 2009 - Present
**Mental Health Therapist**
- Provide specialized mental health services to underserved populations in Thurston, Mason, and Lewis County
- Multidisciplinary team meetings with medical and legal providers
- Supervise clinicians with a focus on Solution-Focused Therapy and Motivational Interviewing

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 18-50403

I am the attorney or self-represented party.

**This brief contains** | 6,921 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ○ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [     ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Jessica Rofé     **Date** | April 17, 2019

*(use* "s/[typed name]" *to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**          *Rev. 12/01/2018*

## CERTIFICATE OF SERVICE

I, Jessica Rofé, hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Appellate CM/ECF System on April 17, 2019.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the Appellate CM/ECF System.


Dated: April 17, 2019                     /s/ Jessica Rofé
                                          Jessica Rofé

                                          *Counsel for* Amici Curiae