No. 18-50403

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

CLAUDIA HERNANDEZ-BECERRA,

*Defendant-Appellant.*

Appeal from the United States District Court for the Southern District of California
Hon. Marilyn L. Huff (Case No. 3:18-mj-20491-WVG-H)

**BRIEF OF NATIONAL IMMIGRATION LAW CENTER, AMERICAN IMMIGRATION COUNCIL, AMERICAN CIVIL LIBERTIES UNION OF ARIZONA, DETENTION WATCH NETWORK, LAWYERS' COMMITTEE FOR CIVIL RIGHTS OF THE SAN FRANCISCO BAY AREA, AND NATIONAL IMMIGRANT JUSTICE CENTER AS AMICI CURIAE IN SUPPORT OF DEFENDANT-APPELLANT**

NORA A. PRECIADO
NATIONAL IMMIGRATION LAW CENTER
3450 WILSHIRE BOULEVARD
# 108-62
LOS ANGELES, CA 90010
TELEPHONE: (213) 639-3900
PRECIADO@NILC.ORG

MARY A. KENNEY
KAROLINA WALTERS
AMERICAN IMMIGRATION COUNSEL
1331 G STREET, NW, SUITE 200
WASHINGTON, DC 20005
TELEPHONE: (202) 507-7512
MKENNEY@IMMCOUNCIL.ORG
KWALTERS@IMMCOUNCIL.ORG

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to the Federal Rules of Appellate Procedure 26.1(a) and 29(a)(4)(A), amici curiae state that they are non-profit organizations and do not have parent corporations. Amici curiae certify that they have no publicly traded stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES .................................................................... iii

I.      INTRODUCTION ........................................................................1

II.     STATEMENT OF AMICI .................................................................2

III.    BACKGROUND    ON    BORDER    PATROL    DETENTION
        FACILITIES ..........................................................................6

IV.     ARGUMENT ............................................................................8

        A.      The Coercive Conditions Endured by Individuals Held in Border
                Patrol Facilities May Render a Subsequent Plea Involuntary..............8

        B.      All Accounts of Conditions in Border Patrol Facilities
                Consistently Demonstrate That the Conditions Are Inhumane
                and Substandard. ................................................................10

                1.  Several Federal Courts Have Ruled on These Substandard
                    Conditions .................................................................10

                    i. *Doe v. Nielsen* ......................................................10

                    ii. *Flores v. Sessions* ...............................................15

                    iii. *United States v. Minero-Rojas* ...............................18

                2.  Non-Governmental Organizations, the Media, and Individuals
                    Have Documented These Substandard Conditions. ...............21

V.      CONCLUSION ...........................................................................27

CERTIFICATE OF COMPLIANCE ...........................................................29

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Bell v. Wolfish*,
    441 U.S. 520 (1979)..........................................................................9

*Boykin v. Alabama*,
    395 U.S. 238 (1969)..........................................................................8

*Clewis v. Texas*,
    386 U.S. 707 (1967)..........................................................................8

*Doe v. Johnson*,
    No. 4:15-cv-00250-TUC-DCB, 2016 WL 8188563
    (D. Ariz. Nov. 18, 2016) ............................................................ *passim*

*Doe v. Kelly*,
    878 F.3d 710 (9th Cir. 2017) ..........................................................10

*Doe v. Nielsen (formerly Johnson)*,
    No. 4:15-cv-00250-TUC-DCB (D. Ariz. filed June 8, 2015).........................5, 11

*Doe v. United States*,
    No. 3:16-CV-0856, 2017 WL 4864850 (M.D. Tenn. Oct. 26, 2017).................20

*Doran v. Wilson*,
    369 F.2d 505 (9th Cir. 1966) ...........................................................9

*Flores v. Johnson*,
    212 F. Supp. 3d 864 (C.D. Cal. 2015) ......................................... 16, 18

*Flores v. Lynch*,
    212 F. Supp. 3d 907 (C.D. Cal. 2015) ............................................16

*Flores v. Meese*,
    No. CV 85-4544-RJK-Px (C.D. Cal. filed July 11, 1985).................................15

*Flores v. Reno*,
  No. CV 85-4544-RJK-Pk (C.D. Cal. Jan. 17, 1997) .................................. *passim*

*Flores v. Sessions*, No.CV-85-4544DMG, 2017 WL 6060252
  (C.D. Cal. June 27, 2017) ....................................................... 16, 17, 18

*Flores v. United States*,
  142 F. Supp. 3d 279 (E.D.N.Y. 2015) ......................................... *passim*

*Greenwald v. Wisconsin*,
  390 U.S. 519 (1968)..................................................................9

*Jackson v. Denno*,
  378 U.S. 368 (1964)..................................................................8

*Taylor v. Maddox*,
  366 F.3d 992 (9th Cir. 2004) ...............................................9

*United States v. Minero-Rojas*,
  No. 11-CR3253-BTM, 2011 WL 5295220
  (S.D. Cal. Nov. 3, 2011) ....................................................... 18, 19, 20

*United States v. Ultiminio Hernandez-Gutierrez*, 11CR2629-BTM,
  Doc. 31, App. F. (S.D. Cal. Sep. 06, 2011) .......................................20

*Villafuerte v. United States*,
  No. 7:16-CV-619, 2017 WL 8793751 (S.D. Tex. Oct. 11, 2017).......................20

**Rules**

Fed. R. App. P. 29(a)(2)............................................................1
Fed. R. App. P. 29(a)(4)(E)........................................................1

**Other Authorities**

Adolfo Flores, *A 40-Year-Old Mexican Immigrant Died in US Custody – The
  Fourth Death in Recent Months*, BuzzFeed News, Mar. 19, 2019.....................26

iv

Adolfo Flores, *A 5-Month-Old Girl Has Been Hospitalized With Pneumonia After Being Detained By The Border Patrol*, BuzzFeed News, Dec. 19, 2018 ........... 27

American Immigration Council, *Way Too Long: Prolonged Detention in Arizona's Border Patrol Holding Cells, Government Records Show* (June 2015) ............... 7

Dep't of Homeland Sec., U.S. Customs & Border Protection, *Border Patrol Sectors*, https://bit.ly/29B2uyg (last accessed April 17, 2019) ...................... 6, 11

Dep't of Homeland Sec., *U.S. Customs and Border Protection National Standards on Transport, Escort, Detention, and Search* 4.1 (Oct. 2015) ............................ 6

Florence Immigrant and Refugee Rights Project, *Seeking Protection, Enduring Prosecution: The Treatment and Abuse of Unaccompanied Undocumented Children in Short-Term Immigration Detention* (2009) ..................................... 22

Guillermo Cantor, American Immigration Council, *Detained Beyond the Limit: Prolonged Confinement by U.S. Customs and Border Protection along the Southwest Border* (Aug. 2016) ........................................................................ 7

Guillermo Cantor, American Immigration Council, *Hieleras (Iceboxes) in the Rio Grande Valley Sector: Lengthy Detention, Deplorable Conditions, and Abuse in CBP Holding Cells* (Dec. 2015) ................................................................ *passim*

Human Rights Watch, *In the Freezer: Abusive Conditions for Women and Children in US Immigration Holding Cells* (2018) ..................................... 24, 25

Khushbu Shah, *Timeline Shows Final Hours of Second Guatemalan Child to Die in US Custody*, The Guardian, Dec. 26, 2018 ........................................................ 26

Maria Sacchetti, *Official: Guatemalan Boy Who Died in U.S. Custody Tested Positive for Influenza B, Final Cause of Death Remains Under Investigation*, Wash. Post, Dec. 28, 2018 .................................................................................. 26

Nick Miroff and Robert Moore, *7-Year-Old Migrant Girl Taken into Border Patrol Custody Dies of Dehydration, Exhaustion*, Wash. Post, Dec. 13, 2018 ............. 26

Nicole Chavez, *Transgender Woman in Migrant Caravan Dies in ICE Custody*, CNN, May 31, 2018 ........................................................................................ 26

No More Deaths, *A Culture of Cruelty: Abuse and Impunity in Short-Term U.S. Border Patrol Custody* (2011) ..................................................................... 22, 23

Sheri Fink and Caitlin Dickerson, *Border Patrol Facilities Put Detainees with Medical Conditions at Risk*, N.Y. Times, Mar. 5, 2019 ......................................25

Sonia Perez D., *Second Guatemalan Child Who Died in U.S. Custody Had the Flu and an Infection*, TIME, Apr. 1, 2019 ................................................................26

U.S. Border Patrol Policy, Subject: Detention Standards, Reference No. 08-11267 (Jan. 31, 2018)...........................................................................................6

U.S. Border Patrol, *Southwest Border Sectors, Total Illegal Alien Apprehensions By Fiscal Year* (FY 1960 - FY 2018) ...................................................... 6, 7, 11

U.S. Border Patrol, *Total Illegal Alien Apprehensions by Month* (FY 2000 - FY 2018) ...........................................................................................11

U.S. Customs & Border Prot., *CBP Security Policy and Procedures Handbook, HB1400-02B* Appendix 8.10: Hold Rooms (Aug. 13, 2009) ...............................6

Women's Refugee Commission, *Halfway Home: Unaccompanied Children in Immigration Custody* (Feb. 2009).......................................................................21

# I.   INTRODUCTION[1]

U.S. Customs and Border Protection (CBP) holds individuals in substandard and inhumane conditions within its detention facilities. Because of CBP's lack of transparency about its facilities, the best information about the conditions comes from the discovery obtained in federal court litigation and from the reports provided by non-governmental organizations (NGOs), the media, and formerly detained individuals. These sources consistently depict that CBP detains individuals in extremely cold, often overcrowded, concrete cells, where adults and children are forced to sleep on the floor for days, are not provided with adequate and sufficient food, potable water, or basic personal hygiene items, and are not adequately screened for illnesses or injuries.

These were precisely the conditions 18-year-old Claudia Hernandez-Becerra endured over three days in the Imperial Beach Detention Facility.[2] Ms. Hernandez-Becerra was held in a freezing and likely overcrowded cell with little food.[3] During those three nights, she barely slept, with nothing but a thin mat and foil sheet as

---

[1] All parties have consented in writing to the filing of this brief. *See* Fed. R. App. P. 29(a)(2). The undersigned counsel certifies that counsel for Amici authored this brief in whole, and that no person other than Amici contributed money to preparing or submitting this brief. *See* Fed. R. App. P. 29(a)(4)(E).
[2] Appellant's Br. 1, ECF No. 6.
[3] Appellant's Br. 1, 7, ECF No. 6.

1

bedding, and with the lights on all night.[4] She could not shower, change clothes, or brush her teeth.[5] On the fourth day, CBP officials transported her to a courthouse.[6] Without any reprieve from the treatment she endured and against the voiced concerns of counsel, the court accepted her guilty plea after a basic inquiry.[7] Our justice system requires further inquiry into the voluntariness of a guilty plea submitted by an individual subjected to the brutal and inhumane conditions in CBP detention facilities to ensure that the plea is knowing and voluntary, and meets the constitutional requirements of Due Process.

## II. STATEMENT OF AMICI

Amici curiae are the National Immigration Law Center, the American Immigration Council, the American Civil Liberties Union of Arizona, Detention Watch Network, the Lawyers' Committee for Civil Rights of the San Francisco Bay Area, and the National Immigrant Justice Center.

The National Immigration Law Center (NILC) is the leading national organization exclusively dedicated to defending and advancing the rights and opportunities of low-income immigrants and their families in the United States. In the last 40 years, NILC has won landmark legal decisions protecting fundamental

---

[4] Appellant's Br. 1, 8-9, ECF No. 6.
[5] Appellant's Br. 1, 8, ECF No. 6.
[6] Appellant's Br. 1, 14-15, ECF No. 6.
[7] Appellant's Br. 1-2, 15-20, ECF No. 6.

rights that reinforce our nation's values of equality, opportunity, and justice. NILC's expertise includes advocacy and litigation related to the constitutional and statutory rights of immigrants in federal immigration detention facilities, including detention conditions.

The American Immigration Council (the Council) is a non-profit organization established to increase public understanding of immigration law and policy, advocate for the just and fair administration of our immigration laws, protect the legal rights of noncitizens, and educate the public about the enduring contributions of America's immigrants. The Council frequently appears before federal courts on issues relating to the due process rights of noncitizens, including those held in immigration detention.

The American Civil Liberties Union of Arizona (ACLU of Arizona) is a statewide nonpartisan, nonprofit organization of over 14,000 members throughout Arizona dedicated to protecting the constitutional rights of all. The ACLU of Arizona is the state affiliate of the national American Civil Liberties Union, our nation's guardian of liberty, working daily in courts, legislatures, and communities to defend and preserve the individual rights and liberties that the Constitution and laws of the United States guarantee everyone. Protecting immigrants' rights is - and has been for many years - one of the ACLU of Arizona's top priorities. The ACLU of Arizona frequently brings litigation and files amicus curiae briefs on a wide range

3

of civil liberties and civil rights issues, including issues related to immigrants' rights and conditions of confinement experienced by people in immigration detention, jails, and prisons.

Detention Watch Network (DWN) is a coalition of approximately 200 organizations and individuals working against the injustices of the immigration detention and deportation systems. DWN members are lawyers, activists, community organizers, advocates, social workers, doctors, artists, clergy, students, formerly detained immigrants, and affected families from around the country. They are engaged in individual case and impact litigation, documenting conditions violations, local and national administrative and legislative advocacy, community organizing and mobilizing, teaching, and social service. For years, DWN and its members have carefully documented egregious abuses inside of detention and advocated to address them systemically through changes to law, policy and practice.

The Lawyers' Committee for Civil Rights of the San Francisco Bay Area (LCCR) is a non-profit organization that combines direct legal services, policy advocacy, and impact litigation strategies to advance the rights of low-income immigrants, refugees, and communities of color. In addition to defending immigrants' civil rights, a cornerstone of LCCR's work is its Asylum Program, which pairs low-income asylum seekers with pro bono counsel. LCCR's substantial interest in this case arises both from its work representing asylum seekers and its

4

civil rights work. LCCR's asylum seeking clients have been subjected to inhumane conditions of confinement in Customs and Border Protection custody across the southern United States border, including in the San Diego Sector.

The National Immigrant Justice Center (NIJC) is a program of the Heartland Alliance, a non-profit corporation headquartered in Chicago, Illinois. NIJC is dedicated to ensuring human rights protections and access to justice for all immigrants, refugees, and asylum seekers. By partnering with more than 1,000 attorneys from the nation's leading law firms, NIJC provides direct legal services to approximately 8,000 individuals annually. This experience informs NIJC's advocacy, litigation, and educational initiatives, as it promotes human rights on a local, regional, national, and international stage. NIJC has a substantial interest in the issue now before the Court, both as an advocate for the rights of immigrants generally and as the leader of a network of pro bono attorneys who regularly represent immigrants. NIJC represents numerous noncitizens who have suffered mistreatment of the types described in this brief.

In addition, NILC, the Council, the ACLU of Arizona, and LCCR's interest in this case arises from their role as co-counsel in a class action challenging the unconstitutional conditions of detention in Border Patrol detention facilities in the CBP Tucson Sector. *See Doe v. Nielsen (formerly Johnson)*, No. 4:15-cv-00250-TUC-DCB (D. Ariz. filed June 8, 2015).

### III.    BACKGROUND ON BORDER PATROL DETENTION FACILITIES

The U.S. Border Patrol, a component of CBP, has nine sectors with more than 70 stations in four states along the U.S. southern border—Texas, New Mexico, Arizona, and California.[8] Most of these stations are equipped with holding cells. During fiscal year 2018, CBP detained approximately 400,000 migrants in these cells.[9]

CBP detention facilities are meant to be short-term processing facilities, designed to hold individuals for the minimal amount of time necessary to complete initial processing.[10] As their own handbook explains, there are "[n]o beds; a hold room is not designed for sleeping."[11] Contrary to this design, however, CBP's data consistently shows that most individuals spend at least one night in these facilities, with many detained for multiple nights. For example, from September 1, 2014 to August 31, 2015, 67 percent of all persons detained along the southwest border were

---

[8] *See* Dep't of Homeland Sec., U.S. Customs & Border Protection, *Border Patrol Sectors*, *available at* https://bit.ly/29B2uyg (last accessed April 17, 2019).

[9] U.S. Border Patrol, *Southwest Border Sectors, Total Illegal Alien Apprehensions By Fiscal Year* (FY 1960 - FY 2018), available at https://bit.ly/2UIhQwP.

[10] *See* U.S. Border Patrol Policy, Subject: Detention Standards, Reference No: 08-11267 3 (Jan. 31, 2008), *available at* https://bit.ly/2VMIVv7 (12 hours); Dep't of Homeland Sec., *U.S. Customs and Border Protection National Standards on Transport, Escort, Detention, and Search* 4.1 (Oct. 2015), *available at* https://bit.ly/2UiyJsV (72 hours).

[11] U.S. Customs & Border Prot., *CBP Security Policy and Procedures Handbook, HB1400-02B* Appendix 8.10: Hold Rooms (Aug. 13, 2009), *available at* https://bit.ly/2FjCOYc.

held for *at least* 24 hours.[12] During this same period, the median length of detention in the San Diego Sector was 26.8 hours.[13] Similarly, between January 1 and June 30, 2013, in the Tucson Sector of Arizona (the second busiest sector along the Southern border[14]), over 80 percent of those detained were held for 24 hours or longer, with more than 34 percent held for at least 48 hours, and over 10 percent held for 72 hours or longer.[15] Data about the length of detention in the Rio Grande Valley Sector of Texas (the busiest sector[16]) during the months of August, September, October, and December 2013 showed that—at all times—a percentage of the population was held for over 72 hours, with the number reaching as high as 42.5 percent.[17] Thus, thousands—if not tens of thousands—of individuals spend multiple nights in these cells, just as did Ms. Hernandez-Becerra.

---

[12] Guillermo Cantor, American Immigration Council, *Detained Beyond the Limit: Prolonged Confinement by U.S. Customs and Border Protection along the Southwest Border* 1-2 (Aug. 2016), *available at* https://bit.ly/2IqeBme (analyzing data CBP produced in response to a Freedom of Information Act request).

[13] *Id.* at 10.

[14] *See* U.S. Border Patrol, *Southwest Border Sectors, Total Illegal Alien Apprehensions By Fiscal Year*, *supra* note 9.

[15] American Immigration Council, *Way Too Long: Prolonged Detention in Arizona's Border Patrol Holding Cells, Government Records Show* 3 (June 2015), *available at* https://bit.ly/2GluibC.

[16] *See* U.S. Border Patrol, *Southwest Border Sectors, Total Illegal Alien Apprehensions By Fiscal Year*, *supra* note 9.

[17] Guillermo Cantor, American Immigration Council, *Hieleras (Iceboxes) in the Rio Grande Valley Sector: Lengthy Detention, Deplorable Conditions, and Abuse in CBP Holding Cells* 1-2 (Dec. 2015), *available at* https://bit.ly/2HLIRrt [hereinafter *Hieleras* Report].

The appalling conditions in CBP facilities, coupled with the length of detention, exacerbate the negative impact of this detention on individuals. Commonly known as "iceboxes," or "hieleras" in Spanish, the facilities are brutally cold, overcrowded, unsanitary, lack beds, adequate food and water, basic personal hygiene items, and medical screening and medical care. *See infra* Section IV.B.

## IV.    ARGUMENT

### A.    The Coercive Conditions Endured by Individuals Held in Border Patrol Facilities May Render a Subsequent Plea Involuntary.

Due process requires that a guilty plea be knowing and voluntary. *See Boykin v. Alabama*, 395 U.S. 238, 242-43, n.5 (1969). Recognizing that a guilty plea "is itself a conviction," the Supreme Court in *Boykin* emphasized the importance of a "reliable determination of the voluntariness" of the plea prior to its admission. *Id.* at 242 (comparing and applying the standard used to determine the admissibility of confessions to the admissibility of guilty pleas) (citing *Jackson v. Denno*, 378 U.S. 368, 376-77 (1964)).

When assessing the voluntariness of a guilty plea, as with coerced confessions, a court is obliged to consider the "totality of the circumstances" impacting the admissibility of the statement. *Clewis v. Texas*, 386 U.S. 707, 708 (1967). In concluding that the statements of detained individuals were involuntary, both the Supreme Court and this Court found relevant the fact that officials denied them food, water, sleep, or access to medication while in detention. *See id*. at 712

8

(noting "substantial concern as to the extent to which petitioner's faculties were impaired by inadequate sleep and food [and] sickness," when considering factors leading to conclusion that petitioner's statement was involuntary); *Greenwald v. Wisconsin*, 390 U.S. 519, 521 (1968) (citing "the lack of food, sleep, and medication" as "relevant to the claim that the [petitioner's] statements were involuntary"); *Taylor v. Maddox*, 366 F.3d 992, 1015 (9th Cir. 2004), *overruled on other grounds by Murray v. Schriro*, 745 F.3d 984 (9th Cir. 2014) (finding petitioner's statement involuntary where "he was given no food, offered no rest break, and may or may not have been given any water," among other factors). Moreover, a guilty plea cannot be "a product of violation of fundamental constitutional rights." *Doran v. Wilson*, 369 F.2d 505, 507 (9th Cir. 1966); *see also Bell v. Wolfish*, 441 U.S. 520, 535 (1979) (punishing a detainee prior to adjudication of guilt constitutes an unconstitutional deprivation of liberty under the Due Process Clause).

As detailed below, CBP holds individuals in pre-arraignment detention in conditions that fall far below the standards of jails and other facilities in which most pre-trial detainees are held. CBP operates these facilities in such a way that detained individuals are deprived of sleep, are given inadequate amounts of food and water, are extremely cold, unable to bathe and, in some cases, are deprived of necessary medical treatment. One federal court has already found that the conditions in Border

Patrol facilities in Arizona—much like the conditions Ms. Hernandez-Becerra endured—are likely unconstitutional. *See Doe v. Johnson*, No. 4:15-cv-00250-TUC-DCB, 2016 WL 8188563, at \*15 (D. Ariz. Nov. 18, 2016), *clarified on denial of reconsideration*, 2017 WL 467238 (D. Ariz. Jan. 3, 2017), *aff'd sub nom.*, *Doe v. Kelly*, 878 F.3d 710 (9th Cir. 2017). Given the prevalence of the coercive, inhumane, and unconstitutional conditions in Border Patrol facilities, the impact of these conditions should be meaningfully considered in an inquiry into the voluntariness of a guilty plea submitted by an individual held in such facilities prior to arraignment.

### B. All Accounts of Conditions in Border Patrol Facilities Consistently Demonstrate That the Conditions Are Inhumane and Substandard.

#### 1. Several Federal Courts Have Ruled on These Substandard Conditions

Three federal court decisions confirm a troubling pattern of inhumane conditions of detention for those detained in these facilities. These decisions support the conclusion that the conditions in Border Patrol detention facilities create a coercive environment - one that could lead a pre-arraignment detainee such as Ms. Hernandez-Becerra to plead guilty in the hope of escaping further detention.

##### i. *Doe v. Nielsen*

On June 8, 2015, two then-detained individuals and one formerly detained individual filed a class action lawsuit in federal district court on behalf of all individuals—men, women and children— detained in Border Patrol holding cells in

CBP's Tucson Sector challenging the constitutionality of the conditions of their detention. *See* Compl. for Declaratory & Injunctive Relief at 1, *Doe v. Johnson*, No. 4:15-cv-00250-TUC-DCB (D. Ariz. June 8, 2015).[18] Specifically, the plaintiffs alleged that the class members' Due Process rights were violated as a result of multiple inhumane detention conditions: being held in overcrowded and filthy conditions, denied beds and bedding, denied basic and necessary personal hygiene products, subjected to unreasonably cold temperatures, not provided adequate and sufficient food and water, and not properly screened for illness, injury or other medical issues. *See id.* at 45-51.

Taking into account the evidence produced in discovery, which included CBP's own detention data and the unprecedented release of hundreds of hours of surveillance video from inside the eight facilities, the district court granted plaintiffs' motion for preliminary injunction, finding that the plaintiffs had "presented persuasive evidence that the basic human needs of detainees are not being met…"

---

[18] The Tucson Sector is comprised of eight facilities where more than 52,000 migrants were apprehended—and thus detained for some period of time—in fiscal year 2018 alone. *See* Dep't of Homeland Sec., U.S. Customs & Border Protection, *Border Patrol Sectors*, *supra* note 8; U.S. Border Patrol, *Southwest Border Sectors, Total Illegal Alien Apprehensions By Fiscal Year*, *supra* note 9; U.S. Border Patrol, *Total Illegal Alien Apprehensions by Month* 19 (FY 2000 - FY 2018), https://bit.ly/2O8mXjm.

and that plaintiffs were likely to succeed with their challenge to the constitutionality of the detention conditions. *Doe*, 2016 WL 8188563, at *3, 16.

In reaching this conclusion, the court first considered the length of detention, finding that from June 10 to September 28, 2015, "only about 3,000 of approximately 17,000 detainees were processed out of Border Patrol station detention within 12 hours." *Id*. at *7. The court next considered the multiple factors which interfered with the class members' ability to sleep, concluding "that the law and the facts clearly favor Plaintiffs' position that Defendants are violating Plaintiffs' constitutional right to sleep." *Id*. at *9. These factors include: "the harshness caused by the lack of mats and the inadequacy of the Mylar blankets" to keep individuals warm; lights being on all day and night; cells which were overcrowded because "occupancy limits are established for detainees sitting up" but "[d]etainees need to lie down to sleep because they are detained at the Border Patrol stations in excess of 12 hours;" and the cold temperatures, exacerbated by the fact that "body heat is affected by the sedentary nature of the detention and whether or not detainees have the ability to move around." *Id*. at *7-9.

With regard to sanitation, the court relied upon the testimony of plaintiffs' sanitation expert who "personally observed holding rooms with floors, walls, benches, drains, toilets, sinks, stalls, and other fixtures …which were badly soiled." *Id*. at *9. In addition, the expert observed that the "toilet stalls lacked waste

12

receptacles for sanitary napkins, diapers, and other bathroom waste . . . [and c]leaning crews did not appear to clean and sanitize common-touch points in detainee areas." *Id*. Based upon these observations, he "concluded that cleaning was not sufficient to sanitize the holding cells . . . [and] that exposure to garbage increases the risk of disease and presence of vermin, and is psychologically stressful." *Id*. Importantly, he also concluded that "[b]lood-born transmission can occur from exposure to diapers and sanitary napkins." *Id*. Based upon this testimony, the court ordered "compliance monitoring" due to "the evidence of noncompliance related to conditions of sanitation" in these facilities. *Id*. at *12.

About personal hygiene, the court noted that "Defendants fail to recognize the basic human need to wash during these detentions." *Id*. at *11. The court pointed out that defendants' own "data confirms that personal hygiene items, including those necessary for feminine hygiene and dental care, were routinely denied." *Id*. at *10. The court preliminarily ordered "compliance monitoring to ensure detainees have access to working toilets and sinks, soap, toilet paper, garbage receptacles, tooth brushes and toothpaste, feminine hygiene items, baby food, diapers, and clean drinking water." *Id*. at *11.

As for medical screening, the court relied upon plaintiffs' medical expert, who testified that "there was no evidence of any formalized screening process being carried out by agents at the detention centers." *Id*. at *13. In his expert opinion,

13

"detainees are high risk for medical problems because they have just crossed the desert under extreme physical hardship, lacking in water and food, without access to medication and medical supplies," an opinion which the court found was supported by defendants' own data. *Id.* at *13-14. Additionally, the court found that the medical screening form used by Tucson Sector Border Patrol was deficient and not in conformance with CBP's national standards. *Id.* at *14. In particular, it "fail[ed] to ask about physical and mental health concerns and prescription medications . . . about pregnancy and whether a detainee is nursing." *Id*. Moreover, the court stressed that "Defendants do not know whether the screening form is being used at all the stations" within the sector. *Id*. Consequently, the court ordered that the Tucson Sector amend its medical intake form to comply with CBP's national standards and ensure that it is used in all the detention facilities in the sector. *Id*.

Recognizing that plaintiffs likely would be able to show that the operational reality of these detention facilities violates class members' constitutional rights, the court stressed that "[i]f detainees are held long enough to require them to sleep in these facilities, take regular meals, need showers, etc., then the Defendants must provide conditions of confinement to meet these human needs." *Id.* at *15. The preliminary injunction in *Doe* is limited to the Tucson Sector of the Border Patrol and CBP is not implementing it other sectors. *Id*. at *1.

14

### ii. *Flores v. Sessions*

In 1985, Jenny Flores, on behalf of herself and all migrant children detained by the former Immigration and Naturalization Service (INS), filed a class action lawsuit challenging several procedures regarding its detention, treatment, and release of children. *See Flores v. Meese*, No. CV 85-4544-RJK-Px (C.D. Cal. filed July 11, 1985). The parties reached a national settlement in 1997.[19] Pursuant to the *Flores* settlement, federal immigration agencies—now including CBP—must "hold minors in facilities that are safe and sanitary and that are consistent with . . . the particular vulnerability of minors." Stipulated Settlement Agreement at ¶ 12, *Flores v. Reno*, No. CV 85-4544-RJK-Pk (C.D. Cal. Jan. 17, 1997). Since then, the plaintiffs repeatedly have had to ask the court to enforce the *Flores* settlement as it relates to "safe and sanitary" detention conditions, including in Border Patrol facilities.

In 2015, in response to plaintiffs' motion to enforce the *Flores* settlement, the court held that "[i]n light of the voluminous evidence that Plaintiffs have presented of the egregious conditions of the [Border Patrol] holding cells, . . . Defendants have

---

[19] *See* Stipulated Settlement Agreement, *Flores v. Reno*, No. CV 85-4544-RJK-Pk (C.D. Cal. Jan. 17, 1997), *available at* https://bit.ly/2ymgDR3. The *Flores* settlement applies to minors, defined as children under the age of 18. *See id.* at ¶ 6. Consequently, it did not apply to Ms. Hernandez-Becerra, who at age 18 missed falling within the class by only a matter of months. Nevertheless, amici include a discussion of *Flores* here because the court's decisions provide further evidence of substandard CBP facilities.

15

materially breached the Agreement's term that Defendants provide 'safe and sanitary' holding cells for class members while they are in temporary custody." *Flores v. Johnson*, 212 F. Supp. 3d 864, 882 (C.D. Cal. 2015), *clarified on denial of recons. sub nom.*, *Flores v. Lynch*, 212 F. Supp. 3d 907 (C.D. Cal. 2015), *aff'd in part, rev'd in part and remanded*, 828 F.3d 898 (9th Cir. 2016). The court's factual findings and order were not restricted to a particular sector but applied to all Border Patrol stations. *See Flores v. Johnson*, 212 F. Supp. 3d at 880-82.

Again, in June 2017, the district court found that the government failed to meet its obligations under the *Flores* settlement, this time with respect to Border Patrol facilities in the Rio Grande Valley Sector.[20] *See Flores v. Sessions*, No. CV-85-4544DMG, 2017 WL 6060252, at *5-12 (C.D. Cal. June 27, 2017), *appeal dismissed*, No. 18-55063, 2018 WL 3472723 (9th Cir. Apr. 27, 2018). The court found that CBP violated the settlement agreement because the sleeping conditions, food, and access to drinking water were all inadequate, the cells were unsanitary and unsafe, and the temperatures were freezing. *Id.*

---

[20] Although the *Flores* settlement is of national scope, because plaintiffs presented evidence of inadequate detention conditions primarily from Border Patrol facilities in the Rio Grande Valley (Texas) Sector, the court limited its holding to the facilities in this sector, with one exception not relevant here. *See Flores v. Sessions*, 2017 WL 6060252, at *5.

In evidence provided to the court, parents and children described sleeping conditions that included "cold temperatures, overcrowding, lack of proper bedding (i.e., blankets, mats), [and] constant lighting." *Id*. at *11. One mother described a cell "so crowded there was barely room for everyone. My son and I were freezing. There were no beds, it was just a room with cement floors and benches.... We were not able to sleep." *Id*.  Another mother reported that it was "very hard to get any sleep because the floor is hard and cold, the cell is very crowded, the lights are on and very bright, and children are crying and coughing all night long." *Id*.

With regards to sanitation and hygiene, the court noted the "apparent disconnect between the CBP's standards and class members' experiences" describing "unsanitary conditions with respect to the holding cells and bathroom facilities, and lack of privacy while using the restroom, access to clean bedding, and access to hygiene products (i.e., toothbrushes, soap, towels)." *Id*. at *8. One woman reported having "no soap, no brush, no change of clothes, no pillows or blankets, and no toothbrushes for three days." *Id*.

As to inadequate food, parents and their children "attested to, among other things, not receiving hot, edible, or a sufficient number of meals during a given day spent at a CBP facility." *Id*. at *6. Based on "the large volume of statements by detainees who described receiving inadequate food," the court found that the defendants were in "substantial non-compliance" with the *Flores* settlement as to

17

food. *Id.* at *7-8. Similarly, evidence showed that access to drinking water was a problem. One individual reported CBP putting a "container with water in our room and gave us one cup to share amongst the 20 people in my cell. The water tasted very bad and the container was not clean." *Id.* at *8. Another woman testified that the water tasted "like chlorine." *Id.*

The court also noted that many parents and children "continue to describe the CBP facilities as *hieleras* or 'iceboxes.'" *Id.* at *10. For example, one mother with a two-year old daughter described being "detained in 'freezing cold' cell," while another mother described holding her three-year-old daughter "tight, wrapping my arms around her to keep her warm.... Her hands started to turn colors, she was so cold." *Id.* Based on "the large volume of specific accounts by Plaintiffs' witnesses that they experienced extreme discomfort with cold temperatures" the court found defendants in non-compliance on this issue as well. *Id.* at *11.

### iii. *United States v. Minero-Rojas*

The conditions discussed in *Doe* and *Flores* are not unique to any specific Border Patrol Sector. *See*, *e.g.*, *Flores v. Johnson*, 212 F. Supp. 3d at 880-82. Notably for the case at hand, at least one district court found that similar conditions existed in the Border Patrol facility in Imperial Beach, California, the same facility where CBP held Ms. Hernandez-Becerra, as well as in another Border Patrol station and the San Ysidro Port of Entry facility within the San Diego Sector. *See United*

18

*States v. Minero-Rojas*, No. 11-CR3253-BTM, 2011 WL 5295220, at *5, 10-11 (S.D. Cal. Nov. 3, 2011).

In *Minero-Rojas*, the defendant sought to dismiss the indictment against him and asked the court to order the government to cease delaying the presentment of criminal defendants before a magistrate judge and subjecting pre-arraignment arrestees to substandard conditions of confinement. *Id*. at *1. In considering the issue, the court reviewed the "substandard conditions of confinement" at the Imperial Beach Border Patrol station, finding that "(1) detainees sleep on the concrete floor and on metal benches; (2) detainees are sometimes provided with a mattress or blanket; (3) detainees are provided with just two meals per day; and (4) detainees are not provided any hygiene items." *Id*. at *5. The court also examined the conditions at the San Ysidro Port of Entry, where Mr. Minero-Rojas was detained prior to his presentment, and found that "(1) detainees are housed in a single cell with up to 20–25 people; (2) detainees sleep on the concrete floor and on metal benches; (3) detainees are provided with at most one blanket; (4) detainees describe cold temperatures where one blanket does not suffice; (4) [sic] detainees are provided with just two meals per day; (5) detainees sleep and eat in the same cell with exposed toilets; and (6) detainees are not provided any hygiene items even after using the toilet or before eating." *Id*. at *5. Finally, the court noted that evidence from another case revealed similar conditions at the Chula Vista Border Patrol

19

station, where "(1) detainees are housed in a cell with about 30 people; (2) detainees are sometimes provided with a cot and blanket; (3) detainees sleep and eat in the same cell with toilets; (4) detainees are provided three rather than two meals a day; (5) but detainees are still not provided any hygiene items." *Id*. (citing *United States v. Ultiminio Hernandez-Gutierrez*, 11CR2629-BTM, at *16, Doc. 31, App. F.).

When examining these conditions, the court acknowledged that the information about "substandard conditions of confinement at various Ports of Entry and Border Patrol stations," including lack of beds, hygiene products, and adequate food, was of "great concern." *Minero-Rojas*, 2011 WL 5295220, at *10. Though the court declined to find a constitutional violation—reasoning that its order addressing the delays of presentment would resolve the conditions of confinement by shortening detainees' time in the Border Patrol stations—it stated that it was "difficult to see how there may be a 'legitimate governmental objective' in not providing pretrial detainees with beds, hygiene products, and adequate food." *Id*. at *11.[21]

---

[21] *See also Doe v. United States*, No. 3:16-CV-0856, 2017 WL 4864850, at *4 (M.D. Tenn. Oct. 26, 2017) (denying motion to dismiss a FTCA case where plaintiffs alleged injury based on deplorable conditions experienced while detained in CBP holding cells in Texas); *Villafuerte v. United States*, No. 7:16-CV-619, 2017 WL 8793751, at *3-4 (S.D. Tex. Oct. 11, 2017) (detailing plaintiff's allegation of conditions in two CBP facilities in the Rio Grande Valley Sector); *Flores v. United States*, 142 F. Supp. 3d 279, 284-86 (E.D.N.Y. 2015) (detailing plaintiff's allegations of conditions in CBP facility in Texas).

As all these cases show, inhumane and deplorable detention conditions have existed in Border Patrol facilities for years and are similar, if not identical, to those experienced by Ms. Hernandez-Becerra.

### 2. Non-Governmental Organizations, the Media, and Individuals Have Documented These Substandard Conditions.

Reporting by NGOs and the media, along with the personal accounts of individuals subjected to the conditions in Border Patrol facilities, confirm the federal courts' findings. Moreover, these accounts demonstrate that conditions have not improved over time—and may have worsened—in Border Patrol facilities across the southern border, including the San Diego Sector where CBP held Ms. Hernandez-Becerra.

Despite the *Flores* settlement, which limited the length of detention for class members to 72 hours in CBP custody, as early as February 2009 the Women's Refugee Commission reported that Border Patrol detained "significant numbers" of unaccompanied children for "much longer than 72 hours."[22] In the same report, covering three Border Patrol stations in Texas, the Women's Refugee Commission described that the holding cells "were exceedingly cold," that "[l]ike adults, children sleep on cold floors, thin mats, plastic sheets, cement benches, newspaper or plastic

---

[22] Women's Refugee Commission, *Halfway Home: Unaccompanied Children in Immigration Custody* 9 (Feb. 2009), *available at* https://bit.ly/2Ixt93u.

'boat beds,'" that children were "not given enough food or water," and that "[t]here [were] no shower facilities or clean clothes available to children."[23]

Subsequently, in August 2009, the Florence Immigrant and Refugee Rights Project released a report based on interviews with 124 unaccompanied minors taken during June and July 2009 that found that the average length of their time in detention was 65 hours—almost three days.[24] Recounting their time in detention, "85 [percent] reported that the holding cells were kept at an excessively low temperature," and "25 [percent] reported that they were not offered any water," along with claims of insufficient food.[25]

Between Fall 2008 and Spring 2011, the organization No More Deaths conducted interviews along the border of New Mexico and Mexico with 12,895 individuals who were detained in CBP facilities.[26] In a 2011 report addressing their findings, No More Deaths confirmed the conditions described in other NGO reports, detailing insufficient access to food, water, and medical care, and other inhumane

---

[23] *Id.* at 9-10.

[24] Florence Immigrant and Refugee Rights Project, *Seeking Protection, Enduring Prosecution: The Treatment and Abuse of Unaccompanied Undocumented Children in Short-Term Immigration Detention* 7, 13 (2009), *available at* https://bit.ly/1prrCKx.

[25] *Id.* at 13-14.

[26] No More Deaths, *A Culture of Cruelty: Abuse and Impunity in Short-Term U.S. Border Patrol Custody*, 5 (2011), *available at* https://bit.ly/1GvjHFc.

conditions, including extreme temperatures, overcrowding, and unsanitary conditions.[27]

Four years later, amici the American Immigration Council issued a report corroborating that the deplorable and substandard conditions in Border Patrol facilities continued to exist. The December 2015 report was based in part on interviews with 391 individuals whom CBP detained in the Rio Grande Valley, Texas, including personal accounts from women held with their children.[28] These women consistently reported: "overcrowding, separation of mothers from their children, inadequate access to medication and/or medical care, extreme temperature, lack of access to showers, food insufficiency, and sleep deprivation."[29]

Specifically, survey data collected between June and January, 2015 revealed that more than 75 percent of those surveyed complained that the cells were extremely cold.[30] One woman stated: "The hielera was freezing cold. To make things worse our clothes were soaking wet from crossing through the river. Because it was so cold our clothes never dried . . .."[31] Similarly, those interviewed described how the conditions interfered with their ability to sleep. As one woman recounted: "We slept

---

[27] *Id.* at 5, 17-23.
[28] *Hieleras* Report, *supra* note 17 at 2, 9, 14-18.
[29] *Id.* at 2.
[30] *Id.* at 10.
[31] *Id.* at 11.

on the floor, but we couldn't really sleep because the lights were on and they were very bright. They also kept making us get up all the time, so sleep was really impossible."[32] In addition, every individual surveyed reported insufficient space to lie down in the holding cells because of severe overcrowding.[33] Ninety-nine percent of individuals surveyed reported receiving insufficient food.[34] In the words of one woman: "While we were in the hielera there was virtually nothing to eat. I was given a piece of bread but my son was not given anything."[35]

A Human Rights Watch report issued in 2018 documented that, two years later, conditions remained the same. Human Rights Watch conducted interviews between April and December 2017 with 110 individuals whom CBP held in detention facilities in Texas, New Mexico, Arizona, and California.[36] Those interviewed "gave consistent accounts of detention in cold cells regardless of whether they were detained in late 2017, at earlier points in the year, or in earlier years."[37] One woman likely held in a facility in or near San Diego in February 2017 recalled: "When more people arrived, they turned up the air conditioning . . . We

---

[32] *Id.* at 17.

[33] *Id.* at 12.

[34] *Id.* at 13.

[35] *Id.*

[36] Human Rights Watch, *In the Freezer: Abusive Conditions for Women and Children in US Immigration Holding Cells*, 4 (2018), *available at* https://bit.ly/2CPlPK1.

[37] *Id.* at 11.

24

slept on the floor with the kids in the middle, trying to keep them covered up as much as possible."[38] Regarding basic personal hygiene, in what Human Rights Watch indicates is a "typical account," a woman held in a CBP facility in California stated that she and her son spent two days in a cell without toothpaste, a change of clothes, or a chance to shower.[39] Other women reported having to use their hands to drink water from the sink next to the toilet, even though CBP did not provide soap so that they could not properly wash their hands after using the toilet.[40] The women and children interviewed also continued to report that the cells were overcrowded,[41] the food was insufficient,[42] and that they were disoriented due to the lights being on all day and night, making sleep extremely difficult.[43]

Notwithstanding the *Doe* court's order and general admonition with respect to medical screening in the Tucson Sector, CBP's medical screening protocols also continue to be inadequate.[44] The severity of this inadequacy is revealed through the

---

[38] *Id.* at 12 (This woman "requested asylum at one of the border crossings between Tijuana and San Diego with her 21-year-old daughter and her daughter's children," *id.*, making it likely that CBP detained her in one of its San Diego facilities.)

[39] *Id.* at 16.

[40] *Id.* at 16, 20.

[41] *Id.* at 19.

[42] *Id.* at 21.

[43] *Id.* at 20.

[44] *See*, *e.g.*, Sheri Fink and Caitlin Dickerson, *Border Patrol Facilities Put Detainees with Medical Conditions at Risk*, N.Y. Times, March 5, 2019, *available at* https://nyti.ms/2UhjNMs (reporting that volunteer clinics for individuals recently released from CBP facilities in the Rio Grande Valley, Texas, may offer "the first

deaths in recent months of four individuals while in CBP detention—including two young children.[45] Jakelin Caal Maquin, a seven-year-old girl detained by Border Patrol, died of a bacterial infection in El Paso, Texas, in early December 2018.[46] On Christmas Eve 2018, Felipe Gomez Alonzo, an eight-year-old boy held in Border Patrol custody in New Mexico for six days died of flu complications and a bacterial infection.[47] Earlier in 2018, a young transgender woman seeking asylum showed "symptoms of pneumonia, dehydration, and 'complications associated with HIV,'" and subsequently died of cardiac arrest after being held in CBP custody for a week.[48]

---

doctors many had seen since crossing the border" and stating that "[f]or at least a decade, families and advocacy organizations have reported lapses in medical care for people in the custody of C.B.P.").

[45] *See* Adolfo Flores, *A 40-Year-Old Mexican Immigrant Died in US Custody – The Fourth Death in Recent Months*, BuzzFeed News, March 19, 2019, *available at* https://bit.ly/2FcCURq.

[46] *See* Sonia Perez D., *Second Guatemalan Child Who Died in U.S. Custody Had the Flu and an Infection*, TIME, Apr. 1, 2019, *available at* https://bit.ly/2I9RrRL; Nick Miroff and Robert Moore, *7-Year-Old Migrant Girl Taken into Border Patrol Custody Dies of Dehydration, Exhaustion*, Wash. Post, Dec. 13, 2018, *available at* https://wapo.st/2YdWnd9.

[47] *See* Perez D., *supra* note 46; Maria Sacchetti, *Official: Guatemalan Boy Who Died in U.S. Custody Tested Positive for Influenza B, Final Cause of Death Remains Under Investigation*, Wash. Post, Dec. 28, 2018, *available at* https://wapo.st/2ULZXJi; Khushbu Shah, *Timeline Shows Final Hours of Second Guatemalan Child to Die in US Custody*, The Guardian, Dec. 26, 2018, *available at* https://bit.ly/2LBF7sz.

[48] Nicole Chavez, *Transgender Woman in Migrant Caravan Dies in ICE Custody*, CNN, May 31, 2018, *available at* https://cnn.it/2NxyE2N.

Others report that CBP ignored their complaints of illness or injury and did not ensure that they received medical care while in custody. For example, a five-month-old girl was hospitalized with pneumonia after spending five days in a CBP facility with her mother.[49] Although the girl had been taking an antibiotic, CBP agents confiscated the medication and when the mother asked to take her child to a hospital, agents told her she "wasn't in a position to be asking for anything and that they didn't tell [her] to come to the United States."[50]

Federal court findings, reporting by third parties, and the personal accounts of those detained by CBP have revealed the consistent inadequacy of the conditions in Border Patrol facilities regardless of the location of the facility or when an individual was detained. Moreover, the findings, reports, and accounts highlight the dehumanizing, even fatal, impact of time spent subjected to these conditions on the individuals detained within the facilities.

## V.    CONCLUSION

For the foregoing reasons, Amici urge this Court to take into consideration the coercive effect of the inhumane and deplorable conditions of Ms. Hernandez-Becerra's pre-arraignment detention when considering the voluntariness of her plea.

---

[49] *See* Adolfo Flores, *A 5-Month-Old Girl Has Been Hospitalized With Pneumonia After Being Detained By The Border Patrol*, BuzzFeed News, Dec. 19, 2018, *available at* https://bit.ly/2A9Or2l.

[50] *Id.*; *see also Hieleras* Report *supra* note 17 at 14-15.

Dated:  April 17, 2019              Respectfully submitted,

s/ Nora A. Preciado
NORA A. PRECIADO
NATIONAL IMMIGRATION LAW CENTER
3450 WILSHIRE BOULEVARD
# 108-62
LOS ANGELES, CA 90010
TELEPHONE: (213) 639-3900

MARY A. KENNEY
KAROLINA WALTERS
AMERICAN IMMIGRATION COUNCIL
1331 G STREET, NW, SUITE 200
WASHINGTON, DC 20005
TELEPHONE: (202) 507-7512

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) and 29(a)(5) and Circuit Rule 32-1(a), because it contains 6,480 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared using Microsoft Word Office 365 ProPlus, is proportionately spaced, and has a typeface of 14 point.

Dated:  April 17, 2019                                     s/Nora A. Preciado
                                                                  Nora A. Preciado

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated:  April 17, 2019                                       s/Nora A. Preciado
                                                                          Nora A. Preciado